1  CAROLINE R. DJANG (SBN: 216313)
   BUCHALTER
2  A Professional Corporation
   18400 Von Karman Avenue, Suite 800
3  Irvine, CA 92612-0514
   Telephone: 949.760.1121
4  Fax: 949.720.0182
   Email: cdjang@buchalter.com
5
   Proposed Attorneys for Employee Loan Solutions, LLC,
6  Debtor and Debtor in Possession

7

8                 **UNITED STATES BANKRUPTCY COURT**

9                 **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  In re                                    Case No. 22-03210-CL11

12  EMPLOYEE LOAN SOLUTIONS, LLC,            Chapter 11

13           Debtor.                         **FIRST DAY MOTION**

14                                           **EMERGENCY MOTION FOR
                                             (1) AUTHORITY TO USE CASH**
15                                           **COLLATERAL ON AN INTERIM
                                             BASIS, (2) GRANTING ADEQUATE**
16                                           **PROTECTION, (3) SCHEDULING A
                                             FINAL HEARING, AND (4) RELATED**
17                                           **RELIEF; MEMORANDUM OF
                                             POINTS AND AUTHORITIES;**
18                                           **DECLARATION OF DOUGLAS
                                             FARRY**
19

20

21

22

23       **TO THE HONORABLE CHRISTOPHER B. LATHAM, CHIEF UNITED STATES**

24  **BANKRUPTCY JUDGE; THE TWENTY (20) LARGEST UNSECURED CREDITORS;**

25  **SUNRISE BANKS, NATIONAL ASSOCIATION; THE OFFICE OF THE UNITED**

26  **STATES TRUSTEE; AND ALL OTHER PARTIES IN INTEREST:**

27       **PLEASE TAKE NOTICE THAT** Employee Loan Solutions, LLC, the debtor and debtor

28  in possession herein (the "Debtor"), hereby moves the Court for an order:

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

1.     Authorizing the use of all cash collateral within the meaning of § 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>"),[1] that is subject to a purported lien in favor of Sunrise Bank, National Association (the "<u>Bank</u>"), on an interim basis, pending a final hearing after notice pursuant to Federal Rule of Bankruptcy Procedure 4001(b), in order for the Debtor to pay ordinary and necessary expenses in accordance with the interim budget (the "<u>Budget</u>") from December 16, 2022 (the "<u>Petition Date</u>") through February 14, 2023, attached as Exhibit B to the Declaration of Douglas Farry in Support the Motion (the "<u>Farry Declaration</u>"), annexed hereto;

2.     Authorizing the Debtor to exceed the amount set forth in the Budget both on a line item and total basis by as much as 20% per month, to the extent that this excess is necessary to meet the operational needs of the business;

3.     Granting the Bank, as adequate protection for the foregoing usage, the following rights:

     a.     The Debtor will grant to the Bank a replacement lien against the Debtor's personal property assets and the proceeds thereof, to the same extent, priority and validity as the lien held by the Bank as of the Petition Date, and subject to the same defenses and avoidance actions as those applicable to the Bank's lien as of the Petition Date;

     b.     Any diminution in the value of the Bank's collateral pursuant to the subject loan over the life of this bankruptcy case shall entitle the Bank to a super-priority claim pursuant to 11 U.S.C. §§ 503(b), 507(a)(2) and 507(b);

     c.     As adequate protection to the Bank, the Debtor proposes to make monthly payments to the Bank in the amount of $51,000; and

     d.     The Debtor will provide the Bank with all interim statements and operating reports required to be submitted to the Office of the United States Trustee, as such reports are submitted, and monthly cash flow reports, broken down

---

[1] Section 363(a) of the Bankruptcy Code defines "cash collateral" as: "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property ... subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title." 11 U.S.C. § 363(a).

by the expense line item contained in the Budget, within twenty (20) days after the end of each calendar month.

4.      The Debtor and all other parties-in-interest reserve any and all rights that they may have to object to the claims of the Bank and to object to the validity, priority and extent of the lien of the Bank encumbering the Debtor's assets.

5.      This Motion is based upon the attached Memorandum of Points and Authorities and the Farry Declaration, and upon such other additional evidence, oral or documentary, that the Court may consider prior to or at the time of the scheduled hearing on the Motion.

WHEREFORE, the Debtor hereby requests that this Court enter an interim order (substantially in the form attached hereto as Exhibit A, the "Interim Order"):

1.      Authorizing the Debtor's use of cash collateral pursuant to the terms and conditions contained in this Motion;

2.      Authorizing the adequate protection as described in this Motion;

3.      Scheduling a final hearing with respect to the relief requested herein; and

4.      Granting such other and further relief as may be just and proper.

DATED: December 19, 2022                    BUCHALTER, a Professional Corporation


By:     _/s/ Caroline R. Djang_____
                CAROLINE R. DJANG
        Proposed Attorneys for Employee Loan
        Solutions, LLC, Debtor and Debtor in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

This Memorandum of Points and Authorities is filed by Employee Loan Solutions, LLC, a Delaware limited liability company, debtor and debtor in possession (the "Debtor"), in support of its *Emergency Motion for (1) Authority to Use Cash Collateral on an Interim Basis (2) Granting Adequate Protection; (iii) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b); and (iv) Granting Related Relief* (the "Motion"), and respectively represents as follows:

## I.      BACKGROUND

On December 16, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manages its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### A.      Jurisdiction and Venue

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The venue of the chapter 11 case of the Debtor is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### B.      Overview of the Debtor and Its Operations

The Debtor is a wholly-owned subsidiary of Emp Loan Holdings Inc. ("Holdings").  In February of 2018, Employee Loan Solutions Inc. converted to the current corporate structure simultaneously with the closing of two loans (collectively, the "Loan") from Sunrise Banks, National Association (the "Bank") totaling approximately $7,600,000. The Bank is a non-statutory insider of the Debtor because the Bank's Chairman and CEO, David Reiling, was one of the original investors in the Debtor.  Mr. Reiling also owns 51,075 shares of Holdings.

The Debtor markets and services a web-based employee benefit platform called TrueConnect™, a trademarked brand since 2016.  TrueConnect™ is an employee financial wellness benefit offered at no cost or financial risk to employers.  Once employers agree to enroll in the TrueConnect™ program, their employees are able to access the financial wellness benefits available on the TrueConnect™ web-based platform.  The employers sign a TrueConnect™ Employer Agreement directly with the Debtor for the service.

One product on the TrueConnect™ platform is the patented No-Credit Check Advance program, which was invented and patented in 2008. The Debtor owns the patent for this program. Once an employer enrolls in the TrueConnect™ benefit program, employees can access a No-Credit Check loan up to $5,000 without regard to their credit score or credit history. The loan decision is automated in the TrueConnect™ technology platform based on the employee's income and length of employment, which is derived from an exchange of the employer's payroll data with the TrueConnect™ platform as described in the patent. All loans are offered at either 19.99% or 24.99% APR with no fees, depending on the employer, and they have an historical charge-off rate of about 3.5% of the outstanding principal. About 15,000 employees from over 120 different employers will have taken a No-Credit Check advance in 2022 totaling about $30,000,000 in consumer loans. Over the next twelve months, more than $18,000,000 in loan payments will be processed by TrueConnect™ through payroll deduction.

When an eligible employee accesses the TrueConnect™ platform online, the TrueConnect™ website verifies them through an immediate and electronic verification of data input by the employee into the TrueConnect™ portal compared to data in the TrueConnect™ system uploaded by employer payroll systems. TrueConnect™ also contracts with a vendor called Persona Identity to further authenticate the borrower by electronic photo of the prospective borrower's driver's license and a matching "selfie" of the applicant. This vendor could also do the required Know-Your-Customer verification, but the Bank instead uses its own separate LexisNexis contract to complete that verification integrated into the TrueConnect™ user experience.

Once the prospective borrower is verified, TrueConnect™'s platform makes the calculations of what loan sizes the employee qualifies for based on the underwriting rules in the platform's system and presents those options to the employee online. The employee selects the loan size they want from the options presented, enters an account number and routing number where they want their loan funds to be deposited. Then, the loans are repaid through automated payroll deductions spread out over a one-year term, based on that employee's payroll schedule and calendar. The employee electronically signs a loan agreement with the Bank using the TrueConnect™ portal and a payroll deduction authorization form using the TrueConnect™ portal,

which is sent to the employer automatically by the TrueConnect™ system. The payroll deduction instructions are also sent automatically to the employer's payroll system by the TrueConnect™ technology platform. The employer then bundles the payroll deducted payments and sends them to the Bank for repayment. The Bank uses a payroll reconciliation file provided by the TrueConnect™ platform to reconcile which employee loan payments to assign to which loans.

These consumer loans experience a close to zero charge-off rate as long as the employee is still employed, because the payments are made by automated payroll deduction by their employer through the TrueConnect™ system. If the employee leaves employment, however, the Bank has sole responsibility for servicing those loans and collecting loan payments outside of payroll deductions. Under the agreements between the Bank and the Debtor, the Bank is required to pay the Debtor 50% of the interest revenue collected on these No-Credit Check advances, less 50% of any charged-off, uncollected principle if the borrower leaves employment and does not continue payments. Debtor is also entitled to 50% of any recoveries the Bank is able to collect post-charge-off. And, the Bank agrees to pay 50% of any commissions owed to benefit brokers or benefit platforms that introduced the TrueConnect™ system to their employer-clients.

In addition to the No-Credit Check Advance, the TrueConnect™ web-based employee benefit program also offers other programs and services to employees of the employers who enroll in the program. These other services are through separate vendors who are under contract the Debtor and in some cases, pay a fee to the Debtor for the connection to prospective customers. These other programs include the following:

    i.    A traditional credit-score personal loan, offered through two different online consumer lending organizations, FinMkt and Lightstream. Employees access these loans through the TrueConnect™ portal.

    ii.    Free credit counseling, under a contract between the Debtor and LLS Financial Counseling.

    iii.    Incentivized emergency savings accounts through a contract between the Debtor and SaverLife.

    iv.    A cash-back rewards program called TrueConnect™ Rewards for online purchases,

1   through a contract between the Debtor and EvoShare.

2       v.   Debt counseling and restructuring services through a contract between the Debtor

3            and Freedom Debt Relief.

4       vi.  A prescription drug discount program through a contract between the Debtor and

5            RXSpark.

6       vii. A virtual bank account program through a contract between the Debtor and Chime.

7       The Debtor markets the TrueConnect™ platform directly to employers and through

8   distribution agreements with major benefit brokers and benefit administration plans.  The Debtor

9   has increased the number of employees with access to the TrueConnect™ platform through their

10  employers by five times in 2022, and more than doubled the loan volume of No-Credit Check loans

11  through their TrueConnect™ platform.  The Debtor predicts that that volume will increase four to

12  six times over the next 12-24 months based on new employers already under contract to offer

13  TrueConnect™ to their employees in 2023, or the expansion of existing contracts to cover more

14  employees with the TrueConnect™ program.

15      **C.    Events Leading to Bankruptcy**

16      The Debtor became cash-flow positive in 2022, however, it will be unable to pay off the

17  Loan (defined below) with the Bank by the maturity date of December 31, 2022 (the "Maturity

18  Date").  Since the summer of 2020, the Debtor has approached the Bank multiple times in an

19  attempt to restructure, extend or renegotiate the approximate $7,600,000 debt owed, without

20  success.  In July of 2022, Debtor engaged an investment banker, Impact Capital, to assist the Debtor

21  in a potential sale or capital infusion.  Although Impact Capital has solicited several interested

22  purchasers and potential lenders, the Bank has refused to extend the Maturity Date, which

23  necessitated the Debtor's bankruptcy filing.

24      **D.    The Loan**

25      On or about February 12, 2018, the Bank and the Debtor entered into a Loan Agreement

26  (the "Loan Agreement").  A true and correct copy of the Loan Agreement is attached to the Farry

27  Declaration as Exhibit C.  The salient terms of the Loan Agreement are as follows:

28      •   Total Principal Loan Amount: $7,536,640, consisting of:

○ Working Capital Loan in the amount of $3,593,292.00

○ Stock Redemption Loan to Holdings in the amount of $3,943,348.00

- Monthly interest payments beginning on March 1, 2018 and continuing until all principal has been paid in full

- Interest: 4% per annum

### E. The Marketing Agreement

The Debtor and the Bank are parties to that certain Amended and Restated TrueConnect Loan Marketing and Servicing Agreement, dated December 4, 2015, as amended from time to time, most recently on May 10, 2022 (the "Marketing Agreement"). Pursuant to the Marketing Agreement, the Debtor shall provide certain business development, marketing and servicing in connection with loans to be originated by the Bank to qualified participants. Under the Marketing Agreement, the Debtor is entitled to compensation equal to 50% of all gross interest received and collected from loans made by the Bank, which shall be payable monthly. Such compensation is offset by 50% of any loss of principal on loans originated by the Bank under the Agreement. The Marketing Agreement expires on December 31, 2022, unless extended by mutual written agreement of the parties.

## II. RELIEF REQUESTED

The Debtor respectfully requests an order of this Court authorizing it to use cash, which comprises the cash collateral of the prepetition secured creditor, the Loan securing its prepetition debt within the meaning of § 363(a) of the Bankruptcy Code (the "Cash Collateral"),[2] for the period of December 16, 2022 through February 14, 2023, on the terms and conditions set forth herein, and as set forth in the projected 60-day budget (the "Budget"),[3] which is attached as Exhibit B to the Farry Declaration and incorporated herein.

---

[2] Section 363(a) of the Bankruptcy Code defines "cash collateral" as: "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property ... subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title." 11 U.S.C. § 363(a).

[3] The Budget is subject to certain contingencies and caveats set forth in the Farry Declaration at ¶ 14.

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

**FIRST DAY EMERGENCY MOTION**

The Debtor proposes to make adequate protection payments to the Bank in the amount of $51,000 per month, which is the regular monthly payment under the terms of the Loan. The Debtor has no other known secured creditors. Based on the foregoing, the Debtor believes that all secured creditors holding purported liens upon the Cash Collateral will be adequately protected.

## III.   BASIS FOR RELIEF

### A.   The Debtor's Need for Use of Cash Collateral

The Debtor requires the immediate use of cash on hand and other income generated from its commercial activities in order to maintain the day-to-day business operations and pay contractors/employees and vendors on a timely basis pending confirmation of a plan. Absent such relief from the Court, the Debtor will not have sufficient liquidity to ensure uninterrupted business operations and will suffer a substantial loss of asset value to the detriment of all parties in interest. Moreover, it is necessary that the Debtor be able to demonstrate to its employees/contractors, vendors, and customers that the Debtor will continue to function without interruption and that the Debtor will continue to pay vendors in the ordinary course of business. Absent such a showing— and in the event of any interruption or delay in the business—contractors/employees will likely pursue opportunities with competitors, which would cripple the Debtor's business.

The interests of the Bank will be protected and enhanced by the Debtor's use of cash collateral because such relief will ensure the uninterrupted operation of the Debtor's business and operations that secure the Bank's claim, thus protecting the Debtor's revenue streams and protecting the going concern value of the Debtor. The ability of the Debtor to finance its operations and the availability to the Debtor of sufficient liquidity is vital to its ability to maintain operations. If the Debtor is unable to obtain approval for the use of cash collateral for such purposes, the recoveries to all creditors, including the Bank, would be greatly reduced because the value of the Debtor's estate would decline dramatically. Entry of an interim order approving the use of cash collateral is therefore (i) critical to the Debtor's ability to reorganize pursuant to the Bankruptcy Code, (ii) in the best interests of the Debtor and its estate and (iii) necessary to avoid irreparable harm to the Debtor, its creditors, and its assets, business, goodwill, reputation and contractors/employees.

**B.** **The Use of Cash Collateral Is Appropriate Under the Current Circumstances and Should Be Authorized**

The Court should authorize the Debtor to use cash collateral, whether existing as of the Petition Date or arising thereafter based on the conversion of existing non-cash collateral into cash. It is essential to the continued operation of the Debtor that it obtains authority to use cash collateral to fund its operating expenses, including the costs of administration of this chapter 11 case.

If the Debtor is permitted to use Cash Collateral to fund ongoing business operations and administration of this chapter 11 case, the Debtor will preserve the value of the Debtor's assets as a going concern. Thus, the Debtor can continue to run its business successfully, but only if it is allowed to use Cash Collateral in the course of the day to day operations. Without such use, the detrimental result to the value of the estate will be rapid and ultimately disastrous, given the nature of the Debtor's business. As set forth in the Farry Declaration, the Debtor requires its employees, contractors and vendors to support and run the various programs available through the TrueConnect™ platform. Access to Cash Collateral is crucial to the Debtor's ability to avoid immediate and irreparable harm to the value of the estate and the creditors, and ongoing business both before and after the Final Hearing (defined below).

Section 363(c)(2) of the Bankruptcy Code sets forth the requirements for a debtor's proposed use of cash collateral. Specifically, section 363(c)(2) provides, in pertinent part:

> The trustee [or debtor in possession] may not use, sell, or Lease cash collateral under paragraph (1) of this subsection unless - (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2). Additionally, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

The Debtor respectfully submits that the proposed use of Cash Collateral is necessary for the Debtor to have sufficient liquidity during the chapter 11 process to preserve the value of its assets and property (including the Prepetition Collateral). The Debtor's proposed use of Cash Collateral thus prejudices no one; it affirmatively and directly benefits the Debtor's estate and

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

**FIRST DAY EMERGENCY MOTION**

1    creditors, including the Bank, and enhances the prospects of a successful outcome in this case.

2    **C.    The Proposed Adequate Protection for the Use of Cash Collateral Is**

3    **Appropriate**

4    In considering whether to authorize use of cash collateral, a court generally must find that

5    the interests of the holder of the secured claim are adequately protected. See 11 U.S.C. § 363(e).

6    Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in

7    property ... proposed to be used, sold, or leased, by the trustee [or debtor in possession], the court,

8    with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to

9    provide adequate protection of such interest." 11 U.S.C. § 363(e).   The Debtor's use of Cash

10   Collateral is conditioned upon adequate protection being provided to the Bank, as set forth herein.

11   The Bank's primary form of adequate protection will be the Debtor's use of Cash Collateral

12   to preserve the going concern value of the Debtor's assets and solely in accordance with the Budget.

13   Courts have held that adequate protection may be demonstrated by a showing that the going concern

14   value of the debtor is preserved by the debtor's continuing operations and use of cash collateral.

15   *See, e.g., In re Snowshoe Co., Inc*., 789 F.2d at 1087-89 (trustee reported that ski resort would lose

16   50% to 90% of its fair market value if it ceased operations).   Moreover, the Bank is more than

17   adequately protected by the Debtor's personal property assets, valued at more than $38,000,000.

18   Additionally, as mentioned above, the Debtor will be granting replacement liens and

19   superpriority claims as adequate protection, which is commonplace.  *See, e.g., MBank Dallas N.A.*

20   *v. O'Connor (In re O'Connor),* 808 F.2d 1393, 1396-98 (10th Cir. 1987) (allowing the debtor to

21   replace a lien on cash with a lien on property likely to be worth five times as much); *Owens-Corning*

22   *Fiberglas Corp. v. Ctr. Wholesale, Inc. (In re Ctr. Wholesale. Inc.)*, 759 F.2d 1440, 1450 (9th Cir.

23   1985) (observing that a lien on additional property of the debtor would likely constitute adequate

24   protection for the secured creditor); *Wrecelesham Grange*, 221 B.R. at 981) (noting that a

25   replacement lien of equal value on postpetition rents is adequate protection); *In re Stein,* 19 B.R.

26   458. 459 (Bankr. E.D. Pa. 1982) (continued lien on debtors' crops, livestock and equipment resulted

27   in an increase rather than a decrease in collateral, and debtors were granted authority to use cash

28   collateral to meet operating expenses during chapter 11 proceedings).

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

**FIRST DAY EMERGENCY MOTION**

Moreover, the Debtor further proposes to pay the Bank $51,000 per month in adequate protection payments.  The proposed monthly adequate protection payment is equal to the amount of the monthly loan payments pursuant to the loan documents between the Debtor and the Bank. The Bank's Prepetition Debt in the amount of approximately $7,600,000 is secured by, among other things, the Debtor's personal property assets, valued at more than $38,000,000.  Thus, the Debtor's use of Cash Collateral as described herein will not prejudice the Bank in any way.

For the foregoing reasons, the Debtor respectfully submits that the adequate protection contemplated herein (described in more detail above) is appropriate and should be approved.

**IV.    REQUEST FOR A FINAL HEARING**

Pursuant to Bankruptcy Rule 4001(b)(2), the Debtor respectfully requests that the Court set a date for a final hearing no later than forty-five days from entry of the Interim Order (the "Final Hearing") and approve the provisions for notice of the Final Hearing and the objection procedures that are set forth in the Interim Order.

**V.    THE NEED FOR IMMEDIATE RELIEF PENDING A FINAL HEARING**

Bankruptcy Rule 4001 (b) provides that a final hearing on a motion for authorization to use cash collateral may not be commenced earlier than fourteen days after service of such motion.  Fed. R. Bankr. P. 4001(b)(2).  Upon request, however, a court may conduct a preliminary expedited hearing on a motion and authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing, based on the business exigencies of individual cases.  *See id.*  The Debtor submits that, for the reasons set forth herein, authority to use Cash Collateral on an interim basis as requested in the Motion is necessary to enable the Debtor to maintain ongoing operations pending a reorganization in this Chapter 11 Case.

**VI.    WAIVER OF BANKRUPTCY RULES 6004(A) AND (H)**

Should the Court grant the Motion and enter the Interim Order, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

**VII.    NOTICE**

Notice of this Motion has been provided to the Office of the United States Trustee for the Central District of California, the Prepetition Secured Creditors and their counsel, all purported secured creditors, the Debtor's 20 largest unsecured creditors, and all parties requesting notices pursuant to Bankruptcy Rule 2002. The Debtor submits that no other or further notice need be provided.  No previous motion for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests entry of an order (i) granting the relief requested herein and (ii) granting the Debtor such other and further relief as the Court deems just and proper.

DATED:  December 19, 2022                    Respectfully Submitted,

BUCHALTER, a Professional Corporation


By:    _/s/ Caroline R. Djang_
                   CAROLINE R. DJANG
         Proposed Attorneys for Employee Loan
         Solutions, LLC, Debtor and Debtor in Possession

**DECLARATION OF DOUGLAS FARRY**

I, Douglas Farry, declare:

1.      I am the Chief Executive Officer of Employee Loan Solutions, LLC, a Delaware limited liability company (the "Debtor").  On December 16, 2022, the Debtor commenced this bankruptcy case.  I make this Declaration in support of the Debtor's *Emergency Motion for (1) Authority to Use Cash Collateral on an Interim Basis, (2) Granting Adequate Protection, (3) Scheduling a Final Hearing, and (4) Related Relief* (the "Motion").

2.      I know of my own personal knowledge each of the facts set forth in this Declaration, except only those facts set forth on information and belief, and as to those facts, I am informed and believe them to be true.  Where facts are stated upon information and belief, I know them to be true of my own personal knowledge or based upon my review of the Debtor's books, records, files and procedures.  If called upon to testify in this action as to the matters set forth herein, I could and would testify competently thereto.

3.      The Debtor is a wholly-owned subsidiary of Emp Loan Holdings Inc. ("Holdings"). In February of 2018, Employee Loan Solutions Inc. converted to the current corporate structure simultaneously with the closing of two loans (collectively, the "Loan") from Sunrise Banks, National Association (the "Bank") totaling approximately $7,600,000.  The Bank's Chairman and CEO, David Reiling, was one of the original investors in the Debtor.  Mr. Reiling also owns 51,075 shares of Holdings.

4.      The Debtor markets and services a web-based employee benefit platform called TrueConnect™, a Trademarked brand since 2016.  TrueConnect™ is an employee financial wellness benefit offered at no cost or financial risk to employers.  Once employers agree to enroll in the TrueConnect™ program, their employees are able to access the financial wellness benefits available on the TrueConnect™ web-based platform.  The employers sign a TrueConnect™ Employer Agreement directly with the Debtor for the service.

5.      One product on the TrueConnect™ platform is the patented No-Credit Check Advance program, which was invented and patented in 2008.  The Debtor owns the patent for this program.  Once an employer enrolls in the TrueConnect™ benefit program, employees can access

**FIRST DAY EMERGENCY MOTION**

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

a No-Credit Check loan up to $5,000 without regard to their credit score or credit history.  The loan decision is automated in the TrueConnect™ technology platform based on the employee's income and length of employment, which is derived from an exchange of the employer's payroll data with the TrueConnect™ platform as described in the patent.  All loans are offered at either 19.99% or 24.99% APR with no fees, depending on the employer, and they have an historical charge-off rate of about 3.5% of the outstanding principal.  About 15,000 employees from over 120 different employers will have taken a No-Credit Check advance in 2022 totaling about $30,000,000 in consumer loans.  Over the next twelve months, more than $18,000,000 in loan payments will be processed by TrueConnect™ through payroll deduction.

6.    When an eligible employee accesses the TrueConnect™ platform online, the TrueConnect™ website verifies them through an immediate and electronic verification of data input by the employee into the TrueConnect™ portal compared to data in the TrueConnect™ system uploaded by employer payroll systems.  TrueConnect™ also contracts with a vendor called Persona Identity to further authenticate the borrower by electronic photo of the prospective borrower's driver's license and a matching "selfie" of the applicant.  This vendor could also do the required Know-Your-Customer verification, but the Bank instead uses its own separate LexisNexis contract to complete that verification integrated into the TrueConnect™ user experience.

7.    Once the prospective borrower is verified, TrueConnect™'s platform makes the calculations of what loan sizes the employee qualifies for based on the underwriting rules in the platform's system and presents those options to the employee online.  The employee selects the loan size they want from the options presented, enters an account number and routing number where they want their loan funds to be deposited.  Then, the loans are repaid through automated payroll deductions spread out over a one-year term, based on that employee's payroll schedule and calendar. The employee electronically signs a loan agreement with the Bank using the TrueConnect™ portal and a payroll deduction authorization form using the TrueConnect™ portal, which is sent to the employer automatically by the TrueConnect™ system.  The payroll deduction instructions are also sent automatically to the employer's payroll system by the TrueConnect™ technology platform. The employer then bundles the payroll deducted payments and sends them to the Bank for

repayment.  The Bank uses a payroll reconciliation file provided by the TrueConnect™ platform to reconcile which employee loan payments to assign to which loans.

8.    These consumer loans experience a close to zero charge-off rate as long as the employee is still employed, because the payments are made by automated payroll deduction by their employer through the TrueConnect™ system.  If the employee leaves employment, however, the Bank has sole responsibility for servicing those loans and collecting loan payments outside of payroll deductions.  Under the agreements between the Bank and the Debtor, the Bank is required to pay the Debtor 50% of the interest revenue collected on these No-Credit Check advances, less 50% of any charged-off, uncollected principle if the borrower leaves employment and does not continue payments.  Debtor is also entitled to 50% of any recoveries the Bank is able to collect post-charge-off.  And, the Bank agrees to pay 50% of any commissions owed to benefit brokers or benefit platforms that introduced the TrueConnect™ system to their employer-clients.

9.    In addition to the No-Credit Check Advance, the TrueConnect™ web-based employee benefit program also offers other programs and services to employees of the employers who enroll in the program.  These other services are through separate vendors who are under contract the Debtor and in some cases, pay a fee to the Debtor for the connection to prospective customers.  These other programs include the following:

    a.    A traditional credit-score personal loan, offered through two different online consumer lending organizations, FinMkt and Lightstream.  Employees access these loans through the TrueConnect™ portal.

    b.    Free credit counseling, under a contract between the Debtor and LLS Financial Counseling.

    c.    Incentivized emergency savings accounts through a contract between the Debtor and SaverLife.

    d.    A cash-back rewards program called TrueConnect™ Rewards for online purchases, through a contract between the Debtor and EvoShare.

    e.    Debt counseling and restructuring services through a contract between the Debtor and Freedom Debt Relief.

f.   A prescription drug discount program through a contract between the Debtor and RXSpark.

g.   A virtual bank account program through a contract between the Debtor and Chime.

10.   The Debtor markets the TrueConnect™ platform directly to employers and through distribution agreements with major benefit brokers and benefit administration plans.  The Debtor has increased the number of employees with access to the TrueConnect™ platform through their employers by five times in 2022, and more than doubled the loan volume of No-Credit Check loans through their TrueConnect™ platform.  The Debtor predicts that that volume will increase four to six times over the next 12-24 months based on new employers already under contract to offer TrueConnect™ to their employees in 2023, or the expansion of existing contracts to cover more employees with the TrueConnect™ program.

11.   The Debtor became cash-flow positive in 2022, however, it will be unable to pay off the Loans (defined below) with the Bank by the maturity date of December 31, 2022 (the "Maturity Date").  Since the summer of 2020, the Debtor has approached the Bank multiple times in an attempt to restructure, extend or renegotiate the approximate $7,600,000 debt owed, without success.  In July of 2022, Debtor engaged an investment banker, Impact Capital, to assist the Debtor in a potential sale or capital infusion.  Although Impact Capital has solicited several interested purchasers and potential lenders, the Bank has refused to extend the Maturity Date, which necessitated the Debtor's bankruptcy filing.

12.   On or about February 12, 2018, the Bank and the Debtor entered into a Loan Agreement (the "Loan Agreement").  A true and correct copy of the Loan Agreement is attached hereto as Exhibit C.  The salient terms of the Loan Agreement are as follows:

- Total Principal Loan Amount: $7,536,640, consisting of:
  - Working Capital Loan in the amount of $3,593,292.00
  - Stock Redemption Loan to Holdings in the amount of $3,943,348.00
- Monthly interest payments beginning on March 1, 2018 and continuing until all principal has been paid in full
- Interest: 4% per annum

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

**FIRST DAY EMERGENCY MOTION**

13.     The Debtor and the Bank are parties to that certain Amended and Restated TrueConnect™ Loan Marketing and Servicing Agreement, dated December 4, 2015, as amended from time to time, most recently on May 10, 2022 (the "Marketing Agreement").  Pursuant to the Marketing Agreement, the Debtor is to provide certain business development, marketing and servicing in connection with loans to be originated by the Bank to qualified participants.  Under the Marketing Agreement, the Debtor is entitled to compensation equal to 50% of all gross interest received and collected from loans made by the Bank, which shall be payable monthly.  Such compensation is offset by 50% of any loss of principal on loans originated by the Bank under the Agreement.  The Marketing Agreement expires on December 31, 2022, unless extended by mutual written agreement of the parties.

14.     Attached hereto as Exhibit B is a projected 60-day budget for the period of December 16, 2022 through February 14, 2023 (the "Budget").

15.     The Budget is subject to the following contingencies and caveats:

a.      The Bank may discontinue underwriting personal loans after December 31, 2022.  If this occurs, the Debtor will not be able to recruit new business, and will be reducing certain expenses, such as marketing.

b.      The Bank may refuse to extend the Marketing Agreement past December 31, 2022.  If so, the Debtor does not expect to receive the $50,000 marketing fee.

c.      The Bank has refused to provide the Debtor with Debtor's share of the charged-off losses or recoveries until the Debtor receives the Bank's net payment.  The amount listed in the Budget is an estimate based on the preceding two months.

d.      The Debtor has an agreement with Brightside Benefit, Inc. ("Brightside") that Brightside will cover losses above 3% annually on its Amazon account, which accounts for approximately 75% of the charged-off losses.  Thus, some of the charged-off losses may be covered by Brightside.

e.      Payment of legal and professional fees is subject to Court approval.  The

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

**FIRST DAY EMERGENCY MOTION**

1                 amount set forth in the Budget is the amount that exceeds the retainers held

2                 by professionals.

3         I declare under penalty of perjury of the laws of the United States of America that the

4 foregoing is true to the best of my knowledge, information and belief.

5    Dated this 19th day of December, 2022

6

7                                      DOUGLAS FARRY

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BUCHALTER
A Professional Corporation
Irvine

**DECLARATION OF DOUGLAS FARRY**

# EXHIBIT A

1  CAROLINE R. DJANG (SBN 216313)
   BUCHALTER
2  A Professional Corporation
   18400 Von Karman Avenue, Suite 800
3  Irvine, CA  92612-0514
   Telephone: 949.760.1121
4  Email:  cdjang@buchalter.com

5  Proposed Attorneys for Employee Loan Solutions, LLC,
   Debtor and Debtor in Possession

6

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **SOUTHERN DISTRICT OF CALIFORNIA**

10 | In re | Case No. 22-03210-CL11 |

11 | EMPLOYEE LOAN SOLUTIONS, LLC, | Chapter 11 |

12 | Debtor. | |

13 | | **INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL AND SETTING FINAL HEARING** |

14 | | |

15 | | Date: |
   | | Time: |
   | | Ctrm.: |

16

17

18      On [date], an emergency hearing was held before this Court, the Honorable Christopher B.

19 Latham, presiding, regarding the Emergency Motion for Authority to Use Cash Collateral on an

20 Interim Basis (the "Motion") filed by Employee Loan Solutions, LLC, the debtor and debtor in

21 possession ("Debtor") on behalf of the bankruptcy estate in the above-captioned case.  Appearances

22 were as noted on the record of the Court.

23      **IT IS HEREBY ORDERED THAT:**

24      1.      The Motion is GRANTED;

25      2.      The Debtor is authorized to use all cash collateral in the form of cash and cash

26 equivalents on hand, and hereafter generated, that is subject to purported lien in favor of Sunrise

27 Banks, National Association (the "Bank"), on an interim basis, pending a final hearing after notice

28 pursuant to Federal Rule of Bankruptcy Procedure 4001(b), in order for the Debtor to pay ordinary

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

20

EXHIBIT A – INTERIM ORDER

and necessary expenses in accordance with the interim budget attached hereto as Exhibit B (the "Budget") from December 16, 2022 (the "Petition Date") through February 14, 2023.

3.      The Debtor is authorized to exceed the amount set forth in the Budget on a line by line and total basis by as much as 20% per month, to the extent that this excess is necessary to meet the operational needs of the business.

4.      Granting the Bank, as adequate protection for the foregoing usage, the following rights:

a.      The Debtor will grant to the Bank a replacement lien against the Debtor's personal property assets and the proceeds thereof, to the same extent, priority and validity as the lien held by the Bank as of the Petition Date, and subject to the same defenses and avoidance actions as those applicable to the Bank's lien as of the Petition Date;

b.      Any diminution in the value of the Bank's collateral pursuant to the subject Bank loan over the life of this bankruptcy case shall entitle the Bank to a super-priority claim pursuant to 11 U.S.C. §§ 503(b), 507(a)(2) and 507(b);

c.      The Debtor shall make monthly adequate protection payments to the Bank in the amount of $51,000; and

d.      The Debtor shall provide the Bank with all interim statements and operating reports required to be submitted to the Office of the United States Trustee, as such reports are submitted, and monthly cash flow reports, broken down by the expense line item contained in the Budget, within twenty (20) days after the end of each calendar month.

5.      The Debtor and all other parties-in-interest reserve any and all rights that they may have to object to the claims of the Bank and to object to the validity, priority and extent of the lien of the Bank encumbering the Debtor's assets.

/ / /

/ / /

/ / /

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

21

EXHIBIT A – INTERIM ORDER

6.      A final hearing on the Debtor's Motion is set for ___ _.m. on _____ ___, 2023 and this Order shall terminate at 11:59 pm on that date, unless extended by Court order.

# # #

EXHIBIT B

**Income**

| | |
|---|---:|
| (Estimated) Interest Revenue share on existing portfolio | $320,000 |
| TrueConnect Marketing Fee (If Agreement is extended by Sunrise) | $50,244 |
| (Estimated) Loan payment recoveries | $5,000 |
| Fee income from Vendor partners | $2,000 |
| **Total Income** | $377,244 |

**Expenses**

| | |
|---|---:|
| (Estimated) ELS Share of Charged off losses on existing portfolio | $150,000 |
| (Estimated) ELS Share of Broker payments | $9,000 |
| Interest Payment on Loan due to Sunrise Banks | $51,000 |

**Employees/Contractors**

| | |
|---|---:|
| Douglas Farry, CEO | $17,558 |
| Jamie Cowper | $4,000 |
| Matthew Mitchell | $7,000 |
| David Rothstein | $4,000 |
| Venkat | $11,000 |
| Lalitha | $6,000 |
| Rebecca Smith | $10,000 |
| Insurance | $4,800 |
| Codero - Servers | $2,500 |
| Gusto - Payroll | $100 |
| Email Service | $70 |
| Server Monitoring Service | $90 |
| Persona Identities | $4,000 |
| Accounting fees | $600 |
| Legal and Professional Services | $50,000 |
| **Total Expenses** | $331,718 |
| **Net Income** | $45,526 |

EXHIBIT C

*Execution*

# LOAN AGREEMENT

This Loan Agreement (the "Agreement") is entered into as of February 12, 2018, between SUNRISE BANKS, NATIONAL ASSOCIATION, a national banking association (the "Bank"), and EMPLOYEE LOAN SOLUTIONS, LLC, a Delaware limited liability company (the "Borrower").

The Bank and the Borrower agree as follows:

## ARTICLE ONE
## THE LOANS

### 1.1  Loans
The Bank agrees, on the terms and subject to the conditions hereinafter set forth, to loan to the Borrower:

(a)     Three Million Five Hundred Ninety-Three Thousand Two Hundred Ninety-Two Dollars ($3,593,292.00) to be used solely for working capital purposes in accordance with Section 2.5(a) of this Agreement (the "Working Capital Loan"). The Working Capital Loan will be evidenced by and be repayable in accordance with a single promissory note in the face amount of Three Million Five Hundred Ninety-Three Thousand Two Hundred Ninety-Two Dollars ($3,593,292.00) issued by the Borrower to the Bank on the Closing Date (as amended or amended and restated from time to time, the "Working Capital Loan Note").

(b)     Three Million Nine Hundred Forty-Three Thousand Three Hundred Forty-Eight Dollars ($3,943,348.00) to be distributed to EMP LOAN Holdings, Inc., a California corporation and sole owner of the Borrower ("Parent"), to be used solely for the redemption of Parent's stock in accordance with Section 2.5(b) of this Agreement (the "Stock Redemption Loan" and together with the Working Capital Loan, each a "Loan" and collectively, the "Loans"). The Stock Redemption Loan will be evidenced by and be repayable in accordance with a single promissory note in the face amount of Three Million Nine Hundred Forty-Three Thousand Three Hundred Forty-Eight Dollars ($3,943,348.00) issued by the Borrower to the Bank on the Closing Date (as amended or amended and restated from time to time, the "Stock Redemption Loan Note").

### 1.2  Other Loan Documents
The Borrower's obligations under the Working Capital Loan Note and Stock Redemption Loan Note (each a "Note" and collectively, the "Notes"), this Agreement and the other documents delivered to the Bank pursuant to this Agreement (all of the foregoing being collectively the "Loan Documents") are subject to and secured by the following, each in form acceptable to and delivered to the Bank:

(a)     a Security Agreement executed by the Borrower (the "Security Agreement");

(b)     A Patent and Trademark Security Agreement executed by the Borrower (the "IP Security Agreement");

(c)     A Guaranty executed by Parent in favor of the Bank (the "Guaranty");

(d)    A Pledge Security Agreement executed by Parent in favor of the Bank (the "Pledge Agreement"); and

(e)    the other documents requested by the Bank in its sole discretion at or before the Closing.

**1.3  Conversion**

(a)    <u>Defined Terms</u>.  Terms used in this Section 1.3 shall have the following meanings:

(i)    "Conversion" has the meaning set forth in Section 1.3(b).

(ii)    "Conversion Event" means the earliest to occur of (i) any Default or (ii) December 31, 2021.

(iii)    "Conversion Notice" has the meaning set forth in Section 1.3(b).

(iv)    "Conversion Price" means $41.62, as it may be adjusted from time to time pursuant to this Section 1.3.

(v)    "Conversion Right" has the meaning set forth in Section 1.3(b).

(vi)    "LLC Agreement" means the Limited Liability Company Agreement of the LLC dated as of the date hereof.

(vii)    "LLC Units" means the Common Units of the Borrower as defined in the LLC Agreement.

(viii)    "Obligations" has the meaning set forth in the Security Agreement.

(ix)    "LLC Units" means the Common Units of the Borrower as defined in the LLC Agreement.

(x)    "Obligations" has the meaning set forth in the Security Agreement.

(xi)    "Reorganization" means the reorganization transaction under Internal Revenue Code Section 368(a)(1)(F) pursuant to which the Borrower converted from a California corporation into a Delaware limited liability company and became a wholly owned subsidiary of Parent.

(b)    <u>Conversion Right</u>.  At any time from and after a Conversion Event, the Bank will have the right (the "Conversion Right") to convert all (and not less than all) of the Obligations into LLC Units (the "Conversion").  The number of LLC Units to be issued will be determined by dividing the total amount of the Obligations by the Conversion Price.  In order to exercise the Conversion Right, the Bank must give written notice of such conversion to the Borrower specifying that the right is exercised as to all of the Obligations (no partial exercise) (the "Conversion Notice").  Upon receipt of the Conversion Notice, the Borrower and Bank will, as

promptly as practicable and in any event within five (5) business days thereof, effectuate the Conversion.  On the date of Conversion, all the Obligations shall be deemed converted into LLC Units in accordance with this Section 1.3(b).  The Borrower and the Bank acknowledge and agree that the Amended and Restated Limited Liability Company Agreement attached hereto as Exhibit 1 shall be serve as the limited liability company agreement of the Borrower and its members from and after the Conversion.

(c)    Adjustments to Conversion Price.  The Conversion Price is subject to adjustment from time to time as follows:

(i)    In case the Borrower at any time hereafter subdivides or splits any outstanding Units into a greater number of Units or declares any dividend payable in Units, the Conversion Price in effect immediately prior to such subdivision, split or dividend will be proportionately decreased, and conversely, in case the outstanding Units of the Borrower is combined into a smaller number of Units, the Conversion Price in effect immediately prior to such combination will be proportionately increased.

(ii)    The Borrower acknowledges that the Conversion Price was calculated based upon an intention that the number of LLC Units receivable upon exercise of the Conversion Right under the Notes would initially constitute 45.11% of all of the LLC Units of the Borrower (assuming the Conversion occurred as of the date hereof), determined on a fully diluted and as-converted basis.  If for any reason it is determined that the calculation of the Conversion Price is erroneous in that exercise of the Conversion Right at the Conversion Price would not result in conversion of the Notes into LLC Units constituting 45.11% of all of the LLC Units of Borrower, then the Conversion Price will be appropriately adjusted effective as of the date hereof.

(iii)    If any event occurs as to which the preceding provisions of this Section 1.3(c) are not strictly applicable, but as to which the failure to make an adjustment to the Conversion Price would not fairly protect the Conversion Right or value represented thereby in accordance with the essential intent and principles of this Agreement, then, in each such case, the Conversion Price or such other provisions of the Conversion Right as appropriate will be adjusted, on a basis consistent with the essential intent and principles established in this Agreement, necessary to preserve the Conversion Right or value represented thereby.

(iv)    Within five (5) business days of any adjustment of the Conversion Price, the Borrower will give written notice thereof to the Bank stating the Conversion Price resulting from the adjustment and the increase or decrease, if any, in the number of LLC Units receivable at that price upon the conversion, setting forth in reasonable detail the method of calculation and the facts upon which the calculation is based.

**1.4  Closing**
Subject to fulfillment of the terms of this Agreement, the Loans shall be made to the Borrower (the "Closing") on the date of this Agreement (the "Closing Date").

**1.5 Conditions Precedent to Closing**

The obligations of the Bank to make the Loans shall be subject to the conditions precedent that on the Closing Date:

      (a)    the Borrower shall have effectuated the Reorganization prior to the Closing Date;

      (b)    the representations and warranties contained in Article Two are true and correct;

      (c)    no Default, or event or condition that with the giving of notice or passage of time or both would constitute a Default, has occurred and is continuing or would result from either Loan;

      (d)    the Bank in its sole and absolute discretion shall consent to the making of the Loans;

      (e)    the Bank shall have received a legal opinion of the legal counsel to the Borrower in favor of the Bank opinion on the enforceability of the Loan Documents under and the non-contravention of California law, and any other opinions reasonably requested by the Bank; and

      (f)    the Bank shall have received the other Loan Documents and all other items set forth on the closing checklist provided by Bank's legal counsel to the legal counsel for the Borrower, other than those that are specified therein as permitted to be delivered after the Closing Date, each in form, substance, execution and delivery reasonably satisfactory to the Bank.

**1.6 Post-Closing Covenants**

Within 60 days from the Closing Date, the Borrower covenants that it will use commercially reasonable efforts to cause Pacific Western Bank and any other bank with which the Borrower retains deposits ("Depositary Bank") to enter into a deposit account control agreement with the Borrower and the Bank to allow the Bank to perfect its security interest in the Borrower's funds set forth in the Depositary Bank.

**ARTICLE TWO**
**REPRESENTATIONS AND WARRANTIES**

To induce the Bank to make the Loans, the Borrower represents and warrants to the Bank that, except as expressly stated to the contrary in the Disclosure Schedule attached hereto as <u>Exhibit 2</u> (the "Disclosure Schedule"):

**2.1   Good Standing**

The Borrower is duly organized, validly existing and in good standing under the laws of its state of domicile, is authorized to engage in the business now carried on by it, and is qualified as a foreign entity to do business in each state where the failure to be so qualified could have a Material Adverse Effect. For purposes of this Agreement, "Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, condition or prospects, financial or otherwise, of the Borrower, (b) the ability of the Borrower to perform its obligations under the Loan Documents, (c) the condition of any material portion of the Borrower's property, or (d) the rights of or benefits available to the Bank under the Loan Documents. Notwithstanding the foregoing,

the parties understand and agree that Borrower is a growing business that is not generating profits at this time.

## 2.2  Outstanding Capital

The authorized and outstanding capital stock or other equity or membership interests of the Borrower as of the date hereof, and all outstanding options, warrants or other rights to acquire any stock or equity or membership interest as of the date hereof are as described in Section 2.2 of the Disclosure Schedule.

## 2.3  Subsidiaries; Benefit From the Loans

The Borrower has no Subsidiaries.  As used in this Agreement, "Subsidiary" means any corporation, partnership, limited liability entity, joint venture, association, joint-stock company, trust or other entity in which the Borrower owns, directly or indirectly, any class of equity interest, membership interest or profit or loss participation interest.

## 2.4  Financial Statements and Forecast

The Borrower has delivered to the Bank the annual financial statements of the Borrower as of December 31, 2016, consisting of a balance sheet, income statement, and the financial statements of the Borrower as of December 31, 2017 (the "Latest Balance Sheet Date"), consisting of a balance sheet and income statement.  All of the foregoing financial statements are referred to collectively as the "Financial Statements". The Financial Statements were prepared in accordance with the methodology used by the Borrower to prepare its tax returns on a cash basis, and present fairly the financial condition of Borrower as of such dates and the results of operations for the periods specified.

## 2.5  Use of Proceeds; Opening Balance Sheet

(a)      The proceeds from the Working Capital Loan shall be used by the Borrower only to pay expenses related to the development, marketing, and sales of the TrueConnect loan product, which, for purposes of clarification, may include personnel expenses associated with the development, marketing, and sales of the TrueConnect loan product.

(b)      The proceeds from the Stock Redemption Loan shall be used by the Borrower to pay Parent for the purpose of redeeming shares of Parent's stock from the shareholders of Parent in the amounts and for the price listed on Section 2.5 of the Disclosure Schedule.  The Borrower has provided the Bank with a true, correct and complete copy of all documents related to the redemption of Parent's shares.

## 2.6  Absence of Certain Changes

Since the Latest Balance Sheet Date, there has been no material adverse change in the business, operations, financial condition or prospects of the Borrower or its business or properties, and the Borrower has not issued, sold or acquired any shares of capital stock or other equity or entered into any transaction or agreement or incurred any liability outside of the ordinary course of business.

## 2.7  Property Ownership; Leases

The Borrower owns, free and clear of all liens and encumbrances (other than liens for taxes not delinquent and liens permitted under Section 3.14 of this Agreement) to all of its real and personal

property reflected on the Financial Statements, other than as disposed of in the ordinary course of business since the Latest Balance Sheet Date. All property or assets not owned by the Borrower and used in the operation of its business, if any, are subject to valid leases held by the Borrower covering its use or occupancy, which leases are not in default. Section 2.7 of the Disclosure Schedule lists all real estate owned or leased by the Borrower and liens or encumbrances on the real estate.

## 2.8  Ownership of Intellectual Property Rights

The Borrower owns or possesses a valid and enforceable license to use all patents, licenses, trademarks, trade secrets, trade names, copyrights and the like (collectively, "Intellectual Property") necessary or appropriate to conduct its business as now conducted and planned to be conducted without conflict with or infringement upon the rights of any other Person. Section 2.8 of the Disclosure Schedule lists all patents, licenses, trademarks, trade secrets, trade names, registered copyrights and royalty agreements of the Borrower. "Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

## 2.9  Litigation

There are no legal proceedings, arbitration proceedings or governmental audits or investigations that are pending or, to the knowledge of the Borrower, threatened against the Borrower or any of its properties, nor is the Borrower or its officers aware of any grounds for any of the foregoing, except for those identified in Section 2.9 of the Disclosure Schedule.

## 2.10  Taxes

All Federal, State and other tax returns and reports of the Borrower required by law to be filed have been filed and all Federal, State and other taxes, assessments, fees and other governmental charges (other than those presently payable without penalty) imposed upon the Borrower, or the properties, assets or payroll of the Borrower, which are due and payable have been paid.

## 2.11  Absence of Prohibition or Liens

There is no provision in the Borrower's certificate of formation, limited liability company agreement or other charter documents or governing instruments (collectively, "Charter Documents"), or in any indenture, contract or agreement to which the Borrower is a party, nor any law, rule or regulations of any governmental authority, which limits or prohibits, or which may in the future limit or prohibit, the execution, delivery or fulfillment by the Borrower of this Agreement or of any of the acts or agreements contemplated by this Agreement or the other Loan Documents, or which results or may in the future result in the creation of any lien or encumbrance on any asset of the Borrower, except for liens in favor of the Bank, or as otherwise allowed under the Loan Documents.

## 2.12  Authorization

The Loan Documents have been reviewed, and their execution and delivery duly authorized, by the Board of Managers or other corresponding governing body of the Borrower. The officers of the Borrower are authorized to execute and deliver the Loan Documents to which it is a party and perform the same in accordance with their respective terms.

## 2.13  Environmental Matters

The Borrower has obtained all material permits, licenses and other authorizations which are required under federal, state and local laws relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, hazardous or toxic materials, or wastes into ambient air, surface water, ground water or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants or hazardous or toxic materials or wastes ("Environmental Laws").  The Borrower and all activities of the Borrower comply with all Environmental Laws and with all terms and conditions of any required permits, licenses and authorizations applicable to the Borrower.  The Borrower is also in material compliance with all limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in the Environmental Laws or contained in any plan, order, decree, judgment or notice.  The Borrower is not aware of, nor has the Borrower received notice of, any events, conditions, circumstances, activities, practices, incidents, actions or plans which may interfere with or prevent continued compliance with, or which may give rise to any liability under, any Environmental Laws or the common law concerning environmental matters.

## 2.14  Finder's or Broker's Fees

The Borrower has not entered into any agreement to pay nor has any obligation to pay any commission, finder's fee, brokerage fee or other fees to any person as a result of the transactions in or contemplated by this Agreement.

## 2.15  Solvency

After giving effect to the execution and delivery of the Loan Documents and the making of any Loan, the Borrower will not be "insolvent" within the meaning of that term as defined in Section 101 of the United States Bankruptcy Code or Section 2 of the Uniform Fraudulent Transfer Act or any other applicable state law pertaining to fraudulent transfers, as each may be amended from time to time, or be unable to pay its or his debts generally as the debts become due, or have an unreasonably small capital to engage in any business or transaction, whether current or contemplated.

## 2.16  Disclosure of Material Facts

No representation, warranty or written statement by the Borrower in any Loan Document, nor any statement, document or certificate furnished or to be furnished by the Borrower or its representatives to the Bank or its representatives in connection with any of the Loan Documents (other than projected financial information, pro forma financial information, budgets, estimates and information of a general economic or industry nature), contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the facts stated therein not misleading.  With respect to projected financial information and pro forma financial information, the Borrower represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time such information was furnished, it being understood that such projected financial information and pro forma financial information are not to be viewed as facts or as a guarantee of performance or achievement of any particular results and that actual results may vary from such forecasts and that such variations may be material and that no assurance can be given that the projected results will be realized.

**2.17  Employment Agreements**

As of the Closing Date, the Borrower is not a party to any written or oral employment contracts with any of its officers and/or employees.

**ARTICLE THREE**
**COVENANTS**

AFFIRMATIVE COVENANTS

The Borrower agrees that, so long as the Notes are outstanding or any other amounts remain owing to the Bank under any of the Loan Documents:

**3.1  Reporting Requirements**

The Borrower shall deliver to the Bank:

(a)    Year-End Financial Statements.  As soon as available and in any event within 120 days after the close of each fiscal year, a balance sheet of the Borrower as of the close of the fiscal year and statements of income and retained earnings and changes in financial position for the year then ended, prepared in accordance with the methodology used in preparing the Borrower's tax returns on a cash basis, consistently applied, that present fairly the financial condition of Borrower as of such dates and the results of operations for the periods specified.

(b)    Quarterly Financial Statements.  As soon as available and in any event within 20 days after each quarterly accounting period, a balance sheet of the Borrower as of the close of each quarter and statements of income and retained earnings for the portion of the fiscal year-to-date then ended, prepared in accordance with the methodology used by the Borrower to prepare its tax returns on a cash basis, consistently applied, that present fairly the financial condition of Borrower as of such dates and the results of operations for the periods specified, together with a comparison to budget for the quarter and the year to date.

(c)    Monthly Cash Disbursements Report.  As soon as available and in any event within 10 days after each calendar month, a report of all cash disbursements made by the Borrower for the calendar month then-ended produced by the off-the-shelf accounting software utilized by Borrower pursuant to Section 3.12 hereof.

(d)    Defaults or Material Adverse Events.  As promptly as practicable (but in any event not later than five days) after any officer of the Borrower obtains knowledge of the existence or occurrence of any Default or of any event or condition which has a Material Adverse Effect on the Borrower, written notice of the Default or event or condition having a Material Adverse Effect, together with a detailed statement by a responsible officer of the Borrower of the steps being taken by the Borrower to cure the effect of the occurrence or event, provided that if such information is provided in an "L-10 Meeting" (a regularly scheduled meeting between Borrower and Bank) at which a representative of Bank is present, no additional notice shall be required.

(e)    Change in Ownership.  As promptly as practicable (but in any event not less than 10 business days prior written notice) of any Change in Ownership.  For purposes of clarification, the Borrower acknowledges and agrees that a Change in Ownership shall constitute a Default under this Agreement.

(f)    Other Information.    Promptly upon Bank's request, such other or further information concerning the Borrower's financial condition, operations, properties or prospects as Bank may reasonably request or which are needed by the Bank to prepare any required reports to its shareholder or to regulatory authorities.

## 3.2  Books and Accounts; Inspection

The Borrower shall keep accurate books of record and account for itself in which true and complete entries will be made in accordance the methodology used by the Borrower to prepare its tax returns on a cash basis, and, upon advance request of the Bank, will give any representative of the Bank access to, and permit the representative to examine, audit, copy or make extracts from, any and all books, records and documents in its possession, to inspect any of its properties and to discuss its affairs, finances and accounts with any of its principal officers, all at times during normal business hours and as often as the Bank may reasonably request.

## 3.3  Prompt Payment of Taxes and Claims

The Borrower will pay when due all taxes, lawful claims for labor, materials, supplies, rents, lease payments and other debts and liabilities which if unpaid would by law be a lien or charge upon the property of the Borrower (other than taxes or claims which are being contested in good faith, and as long as the Borrower's title to its property is not materially adversely affected, or its use of such property in the ordinary course of its business is not materially interfered with and for which adequate reserves have been established, as reasonably determined by the Bank, and for which appropriate provisions have been made in financial statements in accordance with GAAP).

## 3.4  Insurance

The Borrower shall obtain and maintain with financially sound and reputable insurers the insurance as is usually carried by companies engaged in a similar business and owning similar properties in the same general areas in which it operates and, subject to the reasonable satisfaction of the Bank, appropriate for its business.

## 3.5  Maintenance of Properties

The Borrower shall maintain all of its properties that are necessary or useful in its business in good condition, repair and working order.

## 3.6  Budget

At least 90 days prior to its fiscal year-end, the Borrower shall begin developing its budget for the following fiscal year.  At least 30 days prior to the close of each fiscal year, the Borrower's Board of Managers (the "Board") or other corresponding governing body shall review the budget and the Board shall adopt an operating and capital expenditures budget for the next succeeding fiscal year. A copy of the budget with underlying assumptions shall be delivered to the Bank not later than 10 days after approval by the Board.

## 3.7  Existence

The Borrower shall maintain its existence and good standing and conduct its business in a good and businesslike manner.

### 3.8   Compliance with Laws

The Borrower shall comply in all material respects with the requirements of all applicable laws and regulations.

### 3.9   Marketing Agreement

Within 90 days following the Closing, the Bank and the Borrower shall amend that certain TrueConnect Loan Marketing and Servicing Agreement, as amended and restated and as further amended (the "Marketing Agreement") to extend the Marketing Agreement through 2022 and provide for other amendments mutually agreeable to the parties.

### 3.10   Permissible Activities

The Borrower shall engage only in activities that are part of the business of banking, as described in 12 U.S.C. § 24 (Seventh), or activities that are incidental thereto.

### 3.11   Board Observation

The Borrower shall permit the Bank to designate two persons (each, a "Board Observer") to attend each meeting (whether telephonic or in person) in a non-voting capacity of Borrower's Board of Managers, and each executive and other committee meetings thereof. Notwithstanding the foregoing, no such Board Observer designated shall have the right to receive any information that would jeopardize or otherwise impair the Borrower or any of its affiliates' attorney-client privilege. Each such Board Observer shall not be entitled to be present (in-person or telephonically) at the portion of any meeting when any such information is discussed. The reasonable travel expenses incurred by a Board Observer in attending any board or committee meeting held in-person shall be promptly reimbursed by the Borrower to the Bank.

### 3.12   Accounting Software

Within 30 days of the date of this Agreement, Borrower shall purchase and implement an off-the-shelf accounting software acceptable to the Bank (the "Accounting Software"). Borrower shall use the Accounting Software to assist with its bookkeeping functions and for preparation of financial statements and other financial reports until the Obligations have been paid in full and the Loan Documents have been terminated.

NEGATIVE COVENANTS

The Borrower agrees that, so long as the Notes are outstanding or any other amounts remain owing to the Bank under any of the Loan Documents:

### 3.13   Indebtedness

The Borrower shall not incur, create assume or permit to exist any indebtedness for borrowed money, or any other indebtedness or liability evidenced by notes, bonds, debentures or similar obligations, except for (i) indebtedness to the Bank, (ii) indebtedness in existence on the date hereof that is disclosed in Section 3.13 of the Disclosure Schedule and not to be repaid on the Closing Date, but not including any extensions or renewals thereof, (iii) trade credit incurred in the ordinary course of business, (iv) purchase money indebtedness that does not exceed a total of $20,000 outstanding at any time, (v) any revolving credit card debt up to an aggregate outstanding at any time of $50,000, and (vi) any debt incurred in connection with any purchase by Parent of

outstanding shares of stock of Parent under the Shareholder Agreement between Parent and its shareholders as of the date of this Agreement (the "Shareholder Agreement").

### 3.14    Liens or Encumbrances

The Borrower shall not create, incur, assume or suffer to exist any mortgage, pledge, lien or other encumbrance of any kind on any of its properties now owned or hereafter acquired, or acquire or agree to acquire property under any conditional sales agreement or title retention contract, nor engage in any sale-and-leaseback transaction, except for the following liens and encumbrances (the "Permitted Encumbrances"): (i) liens and security interests in favor of the Bank, (ii) those disclosed in Section 3.14 of the Disclosure Schedule which are not to be discharged on the Closing Date, (iii) purchase money liens or security interests covering only property acquired after the Closing Date, and where the amount of the purchase money indebtedness does not exceed 100% of the cost of the acquired property and does not exceed the total amount permitted by Section 3.13, and (iv) security interests of any depository institution in depository accounts held with such institution in the ordinary course of business not in connection with any borrowing or debt.

### 3.15    Dividends or Distributions

Until the Borrower reports positive cash flow for a period of twelve consecutive months, the Borrower shall not, directly or indirectly, without the written consent of the Bank (a) purchase, acquire, redeem or retire any shares of its membership interests or other equity interests or (b) pay any dividends or make any distributions, except for quarterly tax distributions from the Borrower to Parent for distribution to the shareholders of Parent in amounts which do not exceed the portion of their federal and state income tax liability that arises from their capital stock in Parent.

### 3.16    Investments in or Loans to Others

The Borrower shall not invest in, loan or otherwise divert any of its funds to any other Person, it being the intent of this Agreement that the Borrower will apply its full capital and resources to its own business and purposes.

### 3.17    Mergers or Acquisitions

The Borrower shall not consolidate or merge with or into any Person.  The Borrower shall not form any Subsidiary, or acquire all or a substantial part of the assets of any other Person.

### 3.18    Sale of Assets Outside Ordinary Course

The Borrower shall not sell, lease, assign, transfer or otherwise dispose of (whether in one or a series of transactions) any part of its assets to any other Person, except for (i) sales in the ordinary course of business consistent with past practices for fair value, and (ii) sales or leases of surplus, obsolete or worn-out properties in an amount not to exceed $10,000 in any fiscal year.

### 3.19    License of Intellectual Property

The Borrower shall not license, assign, transfer, or otherwise encumber any part of the Intellectual Property to any other person without the prior written consent of the Bank.

### 3.20    Guaranties of Other's Obligations

The Borrower shall not guarantee or endorse any obligation of any other Person, or otherwise assume any contingent liability of or for any other Person.

### 3.21   Management Fees; Loans

The Borrower shall not pay any management or service fees to any affiliate of the Borrower. The Borrower shall not make any loans to any manager or officer.

### 3.22   Change in Ownership

Except for the Conversion, the Borrower shall not cause, permit or suffer to exist any change in its ownership such that Parent owns less than 100% of the outstanding membership units of the Borrower.

### 3.23   Amendment or Breach of Charter Documents

The Borrower shall not amend or breach its Charter Documents.

### 3.24   Substantial Change in Operations

The Borrower shall not make or suffer any substantial change in the nature of its business operations conducted as of the Closing Date.

### 3.25   Inconsistent Agreements

The Borrower shall not enter into any agreement or arrangement that is inconsistent with its obligations under the Loan Documents.

### 3.26   Use of Proceeds

The Borrower shall not use proceeds from the Loans in a manner inconsistent with Section 2.5 of this Agreement.

### 3.27   Equity-Based Compensation

The Borrower shall not enter into any agreement or arrangement that provides for the issuance of equity-related compensation without prior written approval from the Bank.

### 3.28   Employment Agreements

The Borrower will not enter into any agreement with an employee or enter into an employment, agency or other contract or agreement with respect to the performance of personal services.

### 3.29   Bank Accounts

The Borrower shall not open and/or maintain any bank account, deposit account, securities account, or any other account with a financial institution other than the Bank or the Depositary Bank without the prior written approval from the Bank.

**ARTICLE FOUR**
**DEFAULTS**

### 4.1   Defaults.

After the expiration of any cure period (if any) specified in the applicable clause below, any of the following events, acts or conditions, shall constitute a default ("Default"):

     (a)   <u>Failure to Pay Interest or Principal</u>.  Provided that Bank has not failed to pay undisputed amounts owing under the Marketing Agreement, any failure by Borrower to pay when

due any installment of interest or principal owed under any Note or any other amounts due under any other Loan Document, subject to a grace period of ten (10) days following the date due.

(b)   <u>Untrue Representation or Warranty</u>.  Any representation or warranty made by the Borrower to the Bank subsequently proves to have been incomplete or untrue in any material respect as of the Closing Date or as of the date otherwise made, or any statement, certificate or data furnished by the Borrower to the Bank under any Loan Document proves to have been incomplete or untrue in any material respect or misleading under the circumstances in which it was provided as of the date on which the information is stated or certified which remains uncured for five (5) business days after notice; provided, however, that (i) if such breach cannot be remedied with reasonably diligent effort within such 5-business day period, but is susceptible to cure within a period of thirty (30) days and (ii) the continued breach will not have a Material Adverse Effect, Borrower shall have such longer period, not to exceed twenty-five (25) additional days, as Borrower may need to remedy such breach, if Borrower is proceeding with diligent effort to remedy such breach throughout said thirty (30) day period; provided further, however, that in no event shall any grace or curative period will apply if the representation, warranty, certification or other statement was known by Borrower to be false when made or deemed made.

(c)   <u>Covenant Default</u>.  Any breach or a default by the Borrower under any provision of the Loan Documents that is not cured (if capable of cure) to the Bank's satisfaction within thirty (30) days of the date the breach or default occurs, except that no cure period shall apply in the case of a breach or default of the obligations under Sections 3.1(d) or 3.1(e), 3.10, 3.17, 3.18, 3.19, 3.22 or Sections 4.1(a) or (b).

(d)   <u>Bankruptcy or Insolvency</u>.  The Borrower is insolvent, or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors; or applies for or consents to appointment of any receiver, trustee, or similar officer for it or for all or any substantial part of its property; or the receiver, trustee or similar officer is appointed without the application or consent of the Borrower and the appointment is not promptly contested or continues undischarged for a period of 60 days; or the Borrower shall institute (by petition, application, answer, consent or otherwise) any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding relating to it under the laws of any jurisdiction; or any proceeding shall be instituted (by petition, application or otherwise) against the Borrower and is not promptly contested or shall remain undismissed for a period of 60 days.

(e)   <u>Judgment</u>.  There is rendered against the Borrower a final judgment, decree or order for the payment of money in excess of $200,000 and the judgment, decree or order is unsatisfied and in effect for any period of 30 consecutive days without a stay of execution.

(f)   <u>Default on Other Debt</u>.  Any default or event of default under any material (as defined below) bond, debenture, note or other evidence of indebtedness of the Borrower (other than the Notes) or under any indenture or other instrument under which any evidence of indebtedness has been issued or by which it is governed and the expiration of the applicable period of grace, if any, specified in the evidence of indebtedness, indenture or other instrument; <u>provided</u>, that if the default or event of default under the bond, debenture, note or other evidence of indebtedness shall be cured by the Borrower or waived by the holder(s) of the indebtedness, then

the Default hereunder by reason of the default or event of default shall be deemed likewise to have been thereupon cured or waived.  For purposes of this Section, "material" means involving $50,000 in indebtedness under any single bond, debenture, note or other evidence or indebtedness, or involving an aggregate of $70,000 under more than one bond, debenture, note or other evidence of indebtedness of any amount.

(g)    _Material Adverse Event_.  Any event or condition occurs which has a Material Adverse Effect on the Borrower.

(h)    _Change in Ownership_.  Any Change in Ownership shall occur.  For purposes of the Loan Documents, the term "Change in Ownership" shall mean (i) Parent does not own 100% of the outstanding membership units of the Borrower; or (ii) a sale, lease, license, transfer or other conveyance of all or substantially all of the assets of the Borrower.

## ARTICLE FIVE
## REMEDIES

### 5.1   Default Remedies – Conversion Remedy

(a)    In the event of any Default, or at any time thereafter until the Default is cured or waived to the written satisfaction of the Bank, the Bank may, by notice in writing to the Borrower, (i) declare the entire principal amount and accrued interest of the Borrower's debt held by Bank immediately due and payable without presentment, demand, protest, notice of protest or other notice of dishonor of any kind, all of which are waived by the Borrower, and/or (ii) exercise any or all of its remedies under any of the Loan Documents or under applicable law; provided, however, that if a Default occurs under Section 4.1(d) all amounts owing under the Notes and any other Loan Document shall automatically become due and owing.

(b)    In the event of a Default (and the expiration of any applicable cure period included therein), in addition to the other remedies available to the Bank, the Bank may exercise, with immediate effect, the Conversion Right.

### 5.2   No Waiver; Remedies Cumulative

No failure or delay on the part of the Bank in exercising any right, power or remedy under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy under any Loan Document.  The remedies in the Loan Documents are cumulative and not exclusive of any remedies provided by law.

### 5.3   Setoff Right

In addition to the other remedies provided in this Article V or by law, upon any Default and thereafter while the Default is continuing, the Bank is hereby authorized to set off any amounts owed by the Borrower to Bank against any or all property, deposits or credits of the Borrower that are held by the Bank, regardless of the existence or adequacy of any collateral, guaranty or other security, right or remedy available to the Bank.

## ARTICLE SIX
## GENERAL PROVISIONS

### 6.1 Applicable Law

This Agreement is governed by the laws of the State of Minnesota. The provisions of this Agreement shall be severable.

### 6.2 Assignment

None of the rights of the Borrower under the Loan Documents shall be assigned by the Borrower except with the prior written consent of the Bank. Subject to the preceding sentence, the rights and obligations of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. The Bank shall be permitted to assign any and all of its rights under the Loan Documents to any affiliate of the Bank, University Financial Corp. or its shareholders without the written consent of the Borrower or Parent.

### 6.3 Headings; Counterparts

The headings used in this Agreement are intended for informational purposes only and shall not affect its interpretation. Any Loan Document may be signed by means of separate counterparts, and any signed counterpart shall be effective upon delivery by facsimile, electronic transmission, mail, messenger, or personal delivery of a signed signature page thereof.

### 6.4 Amendments, Etc.

No amendment, modification, termination or waiver of any provision of any Loan Document or consent to any departure therefrom shall be effective unless the same shall be in writing and signed by the Bank and, in the case of an amendment, by the Borrower, and in the case of any waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No notice to or demand given to the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

### 6.5 Addresses for Notices, Etc.

Except as otherwise expressly provided herein, all notices, requests, demands and other communications under any Loan Document shall be in writing and mailed or personally delivered to the following address:

If to the Bank:

Sunrise Banks, National Association
Attention: Nichol Beckstrand, President
2525 Wabash Avenue
St. Paul, MN 55114

If the Borrower:

Employee Loan Solutions, LLC
Attention: Michael Maron, President & CEO
215 Highway 101, Suite 105
Solana Beach, CA 92075

or, as to each party, at any other address as shall be designated in a written notice to the other party. All notices, requests, demands and other communications shall be effective when personally delivered or two days after the date when mailed.

**6.6   Enforcement Expenses**

The Borrower shall be obligated to pay or reimburse the Bank for paying all out-of-pocket expenses incurred by the Bank in connection with the enforcement of the Loan Documents and the other instruments and documents to be delivered hereunder or thereunder, including the reasonable fees and out-of-pocket expenses of legal counsel to the Bank, but excluding the Bank's costs and fees associated with a Conversion hereunder.

**6.7   Indemnification**

The Borrower agrees to indemnify the Bank, its successors and assignees, any other holders of the Notes, and each of their respective officers, directors, employees, agents and representatives (collectively, "Indemnified Parties") from any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, out-of-pocket costs, expenses or disbursements of any kind and nature whatsoever, including but not limited to the fees and expenses of legal counsel, incurred by or asserted against any of the Indemnified Parties in any way relating to or arising out of any Loan Document. The obligations of the Borrower under this Section shall survive payment of the Notes.

**6.8   Further Assurances**

The Borrower will, promptly upon request of the Bank (i) correct any defect, error or omission which may be discovered in the contents, execution or acknowledgment of any Loan Document; and (ii) execute, acknowledge, deliver, procure and record and/or file any further documents and do the further acts as may be reasonably necessary, desirable or proper to carry out more effectively the purposes of any Loan Document, or to more fully identify and subject to the liens and interests hereof any property intended to be covered hereby or as reasonably deemed advisable by the Bank to protect or perfect the Bank's security interest against the rights or interests of any third party. The Borrower will, promptly on request of the Bank, provide the certificates, documents, reports, information, affidavits and other instruments and do the further acts as may be necessary, desirable or proper in the determination of the Bank to enable the Bank to comply with the requirements or requests of any agency having jurisdiction over the Bank.

**6.9   Time of the Essence**

Time is of the essence with respect to the payment, performance and observance by the Borrower of each term and provision of each Loan Document.

**6.10   Document Imaging**

Without notice to or consent of the Borrower, the Bank may create electronic images of this Agreement and the other Loan Documents and destroy paper originals of any such imaged documents. Provided that such images are maintained by or on behalf of the Bank as part of the Bank's normal business processes, the Borrower agrees that such images have the same legal force and effect as the paper originals, and are enforceable against the Borrower. The Bank may convert any Loan Document into a "transferrable record" as such term is defined under, and to the extent permitted by, the Uniform Electronic Transactions Act ("UETA"), with the image of such instrument in the Bank's possession constituting an "authoritative copy" under the UETA.

### 6.11   Consent to Jurisdiction

AT THE OPTION OF THE BANK, EACH LOAN DOCUMENT MAY BE ENFORCED IN ANY FEDERAL COURT OR MINNESOTA STATE COURT SITTING IN MINNEAPOLIS OR ST. PAUL, MINNESOTA; AND THE BORROWER AND THE BANK EACH CONSENTS TO THE JURISDICTION AND VENUE OF THOSE COURTS AND WAIVES ANY ARGUMENT THAT VENUE IN THOSE FORUMS IS NOT CONVENIENT.   IN THE EVENT THE BORROWER COMMENCES ANY ACTION IN ANOTHER JURISDICTION OR VENUE UNDER ANY TORT OR CONTRACT THEORY ARISING DIRECTLY OR INDIRECTLY FROM ANY LOAN DOCUMENT OR THE RELATIONSHIP CREATED THEREUNDER, THE BANK AT ITS OPTION SHALL BE ENTITLED TO HAVE THE CASE TRANSFERRED TO ONE OF THE JURISDICTIONS AND VENUES ABOVE-DESCRIBED, OR IF THE TRANSFER CANNOT BE ACCOMPLISHED UNDER APPLICABLE LAW, TO HAVE THE CASE DISMISSED WITHOUT PREJUDICE.

### 6.12   Waiver of Trial by Jury

EACH OF THE BORROWER AND THE BANK HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH ANY LOAN DOCUMENT OR RELATED TRANSACTIONS, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

### 6.13   Specific Performance

The Borrower acknowledges that monetary damages would not be a sufficient remedy for breach of this Agreement.  Therefore, upon breach of this Agreement by the Borrower, the Bank may proceed to protect its rights and enforce this Agreement by suit in equity, action at law or other appropriate proceeding, including an action for the specific performance of any provision herein or any other remedy granted by law, equity or otherwise.  Any action for specific performance hereunder shall not be deemed exclusive and may also include claims for monetary damages as may be warranted under the circumstances.

*[Signatures are on following page]*

In Witness Whereof, the parties have executed this Agreement as of the date first written above.

BORROWER:

EMPLOYEE LOAN SOLUTIONS, LLC

By _____

Its  Chief Executive Officer

BANK:

SUNRISE BANKS, NATIONAL ASSOCIATION

By_____

Its_____

In Witness Whereof, the parties have executed this Agreement as of the date first written above.

BORROWER:

EMPLOYEE LOAN SOLUTIONS, LLC

By _____   _____
Its _____

BANK:

SUNRISE BANKS, NATIONAL ASSOCIATION

By _Michael L. Beckstrand_
Its _President_

## EXHIBIT 1

FORM OF AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

[attached hereto]

*ELS Draft 2/8/2018*

**EXHIBIT 1**
**TO LOAN AGREEMENT**

**EMPLOYEE LOAN SOLUTIONS, LLC**

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

_____, 20\_\_

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ........................................................................................................2
    1.1    Definitions........................................................................................................2

ARTICLE II FORMATION OF LIMITED LIABILITY COMPANY ........................................8
    2.1    Formation ........................................................................................................8
    2.2    Name and Principal Place of Business............................................................9
    2.3    Agreement........................................................................................................9
    2.4    Business ...........................................................................................................9
    2.5    Definitions........................................................................................................9
    2.6    Term ................................................................................................................9

ARTICLE III MEMBERS AND INTERESTS .........................................................................10
    3.1    Units Generally ..............................................................................................10
    3.2    Classes of Units..............................................................................................10
    3.3    Members ..........................................................................................................10
    3.4    Representations and Warranties......................................................................10
    3.5    Additional Members .......................................................................................11
    3.6    Resignation or Withdrawal of a Member........................................................12
    3.7    Meetings of the Members ...............................................................................12
    3.8    Action by Written Consent .............................................................................13
    3.9    Limited Liability of Members.........................................................................13
    3.10    No Appraisal Rights.......................................................................................14
    3.11    General Voting Rights ....................................................................................14
    3.12    No Fiduciary Duties Owed by the Members ...................................................14
    3.13    Related Party Transactions .............................................................................14
    3.14    Guaranteed Payments.....................................................................................14
    3.15    Special Voting Provisions for EMP LOAN Holdings .....................................15
    3.16    Special Member Voting Provisions ................................................................15
    3.17    No Allocation of Sunrise Expenses, Taxes.....................................................15

ARTICLE IV CONTRIBUTIONS TO CAPITAL; WITHDRAWALS; ADVANCES................15
    4.1    Capital Contributions .....................................................................................15
    4.2    No Right of Withdrawal...................................................................................16
    4.3    Advances.........................................................................................................16

ARTICLE V MANAGEMENT AND RESTRICTIONS ...........................................................16
    5.1    Management by Board of Managers; Board of Managers................................16
    5.2    Amendment of Certificate or Agreement ........................................................18
    5.3    No Fiduciary Duties ........................................................................................18

ARTICLE VI NOTICES...........................................................................................................19
    6.1    Notices ............................................................................................................19
    6.2    Waiver of Notice.............................................................................................19

i

ARTICLE VII OFFICERS ................................................................................................19
    7.1    Officers ................................................................................................19
    7.2    Reliance by Third Parties ................................................................20
    7.3    Actions and Determinations of the LLC .........................................20

ARTICLE VIII ACCOUNTING AND RECORDS ............................................................21
    8.1    Financial and Tax Reporting ...........................................................21
    8.2    Members Access to Certain Information ..........................................21
    8.3    Supervision; Inspection of Books ...................................................21
    8.4    Tax Information ................................................................................21
    8.5    Tax Audits .......................................................................................21
    8.6    Confidentiality ................................................................................22

ARTICLE IX CAPITAL ACCOUNTS AND  ALLOCATIONS OF NET INCOME AND
NET LOSS ......................................................................................................................23
    9.1    Capital Accounts .............................................................................23
    9.2    Allocations of Net Income and Net Loss ........................................24
    9.3    Special Allocation Provisions .........................................................24
    9.4    Curative Allocations .......................................................................26
    9.5    Tax Allocations ...............................................................................26
    9.6    Compliance with Section 704(b) of the Code .................................26

ARTICLE X DISTRIBUTIONS .......................................................................................26
    10.1    Distributions ....................................................................................26
    10.2    Tax Distributions .............................................................................27
    10.3    Liquidation Event Distributions ......................................................28
    10.4    No Other Withdrawals .....................................................................28
    10.5    Distribution Limitations ..................................................................28

ARTICLE XI TRANSFER OF MEMBERSHIP ...............................................................29
    11.1    Transfer ...........................................................................................29
    11.2    Transfer Void ..................................................................................29
    11.3    Effect of Assignment ......................................................................29
    11.4    Legends ...........................................................................................29
    11.5    Publicly Traded Partnership Limitations ........................................30
    11.6    Effective Date .................................................................................30
    11.7    "Market Stand-Off" Agreement ......................................................30
    11.8    Redemption .....................................................................................31

ARTICLE XII INDEMNIFICATION AND LIMITATION OF LIABILITY ....................31
    12.1    Indemnification ...............................................................................31
    12.2    Exculpation by Members .................................................................33
    12.3    Limitation of Liability .....................................................................34

ARTICLE XIII DISSOLUTION AND TERMINATION ..................................................34
    13.1    Dissolution ......................................................................................34
    13.2    Authority to Wind Up .....................................................................34

| | | |
|---|---|---:|
| 13.3 | Winding Up and Certificate of Cancellation | 35 |
| 13.4 | Distribution of Assets | 35 |
| 13.5 | Conversion to a Corporation | 35 |
| **ARTICLE XIV MISCELLANEOUS** | | **36** |
| 14.1 | Amendment | 36 |
| 14.2 | Power of Attorney | 36 |
| 14.3 | Withholding | 37 |
| 14.4 | Apportionment of Amounts Withheld at the Source or Paid by the LLC | 38 |
| 14.5 | Notice to and Consent of Members | 38 |
| 14.6 | Further Assurances | 38 |
| 14.7 | Binding Effect | 38 |
| 14.8 | Governing Law | 39 |
| 14.9 | Title to LLC Property | 39 |
| 14.10 | Dispute Resolution | 39 |
| 14.11 | Entire Agreement | 39 |
| 14.12 | Counterparts | 39 |
| 14.13 | No State-law Partnership | 40 |
| 14.14 | Tax Classification | 40 |
| 14.15 | Severability | 40 |
| 14.16 | No Third Party Beneficiary | 40 |
| 14.17 | Interpretation | 40 |

| | |
|---|---|
| EXHIBIT A | Members; Units |
| EXHIBIT B | Board of Managers & Officers |
| EXHIBIT C | Board of Managers Powers |
| EXHIBIT D | Member Powers |
| EXHIBIT E | Employment Terms |

iii

# EMPLOYEE LOAN SOLUTIONS, LLC

## AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY AGREEMENT

This Amended and Restated Limited Liability Company Agreement (the "**Agreement**") of Employee Loan Solutions, LLC, a Delaware limited liability company (the "**LLC**") is entered into pursuant to the Delaware Limited Liability Company Act, Delaware Code Ann. Title 6, §§18-101, et seq. (the "**Act**"), effective as of _____ ___, 20__ (the "**Effective Date**"), by and between Sunrise Banks, N.A., a national banking association ("**Sunrise**"), and EMP LOAN Holdings, Inc., a California corporation ("**EMP LOAN Holdings**"), each having duly executed this Agreement or a counterpart to this Agreement intending to be legally bound by the following terms and conditions.

## RECITALS

A.    On or about _____ ___, 2018, all of the issued and outstanding capital stock of Employee Loan Solutions, Inc., a California corporation, was contributed to EMP LOAN Holdings in a transaction that qualified for tax deferred treatment pursuant to Section 368(a)(1)(F) of the Code (the "**Reorganization**").

B.    As a result of the Reorganization, Employee Loan Solutions, Inc. became a wholly owned subsidiary of EMP LOAN Holdings.

C.    Pursuant to a Plan of Conversion dated prior to the date hereof (a) in accordance with Chapter 11.5 of the California General Corporation Law, Employee Loan Solutions, Inc. converted into Employee Loan Solutions, LLC, a California limited liability company, and (b) subsequent thereto, in accordance with Article 10 of the California Revised Uniform Limited Liability Company Act and Section 18-214 of the Act, Employee Loan Solutions, LLC converted into the LLC, and the LLC became the successor-by-conversion to Employee Loan Solutions, Inc. (the "**LLC Conversion**").

D.    As a result of the Reorganization and the LLC Conversion, 100% of the issued and outstanding membership interests of the LLC were owned by EMP LOAN Holdings.

E.    On or about the date of the Reorganization and LLC Conversion, Sunrise provided two loans to the LLC (together, the "**Loans**"), under the terms of a Loan Agreement between Sunrise and the LLC (the "**Loan Agreement**"). Under the terms of the Loan Documents (as defined in the Loan Agreement) in certain events Sunrise was entitled to convert the Loans into its Membership Interest in the LLC (the "**Conversion**").

F.    Sunrise has elected the Conversion as of the Effective Date and upon the Conversion, (i) Sunrise became a Member of the LLC and both Sunrise and EMP LOAN Holdings are deemed to have made a Capital Contribution and (ii) the LLC will negotiate and enter into

**Page 1**

Employment Agreements with each of Michael Maron, Doug Farry and Diego Guayan[1] in a form reasonably acceptable to such individuals and the LLC consistent with the terms set forth on Exhibit E.

G.    On the date hereof, this Agreement creates a binding contract between EMP LOAN Holdings and Sunrise (together, the "**Parties**").

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

**1.1**    **Definitions**. The following terms shall have the meanings set forth for purposes of this Agreement:

"**1934 Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Accounting Period**" shall mean for each Fiscal Year the period beginning on the 1st of January and ending on the 31st of December; *provided, however*, that the first Accounting Period commenced on the date of formation of the LLC and shall end on December 31 of the year of formation of the LLC; and *provided, further*, that, at the election of the Board of Managers, a new Accounting Period shall commence on any date on which an Additional Member is admitted to the LLC or a Member ceases to be a Member for any reason.

"**Act**" shall have the meaning ascribed to it in the Preamble.

"**Additional Interests**" shall have the meaning ascribed to it in Section 3.5(a).

"**Additional Member**" shall have the meaning ascribed to it in Section 3.5(b).

"**Affiliates**" shall mean, with respect to any specified Person, a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, the Person specified, including, without limitation, any venture capital fund now or hereafter existing which is controlled by or under common control with such Person or which shares the same management company with such Person.

"**Agreement**" shall mean this Limited Liability Company Agreement of the LLC as the same shall be amended from time to time.

---

[1] Note:  To the extent they are employees of the LLC at such time.

**Page 2**

"**Board of Managers**" or "**Board**" shall mean the LLC's Board of Managers, as constituted from time to time, as described more fully in Article V.

"**Business Day**" shall mean any day on which banks located in Dover, Delaware are not required or authorized by law to remain closed.

"**Capital Account**" shall mean, with respect to any Member, the account maintained for such Member in accordance with the provisions of Section 9.1(a) hereof.

"**Capital Contribution**" shall mean, with respect to any Member, any contribution to the LLC by such Member of cash or other property. Any reference in this Agreement to the Capital Contribution of a Member shall include the Capital Contribution made by any predecessor holder of the Interest of that Member.

"**Carrying Value**" shall mean:

(a)     with respect to any LLC asset, the asset's adjusted basis for U.S. federal income tax purposes, except as follows:

(i)     the Carrying Value of any asset contributed or deemed contributed by a Member to the LLC shall be the fair market value of such asset at the time of contribution as determined by agreement of the Members;

(ii)     the Carrying Value of any asset distributed or deemed distributed by the LLC to any Member shall be adjusted immediately prior to such distribution to equal its fair market value at such time;

(iii)     the Carrying Values of all LLC assets shall be adjusted to equal their respective fair market values as of the following times:

(1)     immediately prior to the date of the acquisition of any additional Interest by any new or existing Member, other than in exchange for a de minimis Capital Contribution;

(2)     immediately prior to the date of the distribution of more than a de minimis amount of LLC property to a Member;

(3)     the liquidation of the LLC within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and

(4)     in connection with the grant of an Interest (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the LLC or a subsidiary of the LLC by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity in anticipation of becoming a Member; provided that an adjustment described in subclauses (1), (2) and (4) of this clause (iii) shall be made only if the Board of Managers reasonably determines that such adjustment is necessary to reflect the collective economic interests of the Members in the LLC.

**Page 3**

In the case of any asset that has a Carrying Value determined pursuant to subclauses (1), (2) or (4) above, depreciation or deductions shall be computed based on the asset's Carrying Value as so determined, and not on the asset's adjusted tax basis, as more fully described under the definition of Net Income and Net Loss below.

(b) with respect to any liability, at a given time, the amount of such liability to the extent:

(i) reflected in the basis of any asset;

(ii) previously or currently deductible in computing Net Income or Net Loss or otherwise for Capital Account maintenance purposes; or

(iii) otherwise previously taken into account for Capital Account maintenance purposes.

"**Certificate**" shall have the meaning ascribed to it in Section 2.1.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Common Members**" shall mean Members holding Common Units, their permitted successors and assigns and any other Person who may be admitted to the LLC as a Common Member in accordance with the terms of this Agreement.

"**Common Units**" shall have the meaning ascribed to it in Section 3.2(a).

"**Compensation Amount**" shall have the meaning ascribed to it in Section 3.14.

"**Contingent Consideration**" shall have the meaning ascribed to it in Section 10.3(b).

"**Convertible Securities**" means convertible Units or other securities convertible into or exchangeable for (i) Units or (ii) any other securities evidencing an ownership interest in the LLC, including, without limitation warrants and options.

"**DGCL**" shall mean the Delaware General Corporation Law, 8 Del. Code § 101 et seq.

"**Designated Jurisdiction**" shall mean Solana Beach, California.

"**Disability**" shall mean that the person is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment.

"**Effective Date**" shall have the meaning ascribed to it in the Preamble.

"**Electronic Signature**" shall have the meaning ascribed to it in Section 14.12.

"**EMP LOAN Holdings Manager**" shall have the meaning ascribed to it in Section 5.1(c).

**Page 4**

"**Equity Securities**" shall mean any Units, any securities evidencing an ownership interest in the LLC, or any Convertible Securities.

"**Estimated Tax Period**" shall mean, for each Fiscal Year, the periods of January 1 through March 31, April 1 through May 31, June 1 through August 31, and September 1 through December 31.

"**Estimated Tax Distribution**" shall have the meaning ascribed to it in Section 10.2.

"**Fiscal Year**" shall mean the taxable year of the LLC, which shall be the period from January 1 to December 31 of each year, except as otherwise required by the Code.

"**GAAP**" shall mean United States generally accepted accounting principles.

"**Incorporation**" shall have the meaning ascribed to it in section 13.5.

"**Initial Offering**" shall mean the LLC's first firm commitment underwritten public offering of the equity of the LLC (or its successor entity).

"**Interest**" shall mean the Units of a Member in the LLC and includes all of the respective rights and responsibilities appurtenant thereto including the right, if any, to vote, the Capital Account maintained for such Member and the right to receive allocations of Net Income and Net Losses pursuant to Article IX, and the right to receive distributions of cash or property of the LLC.

"**Law**" shall mean any constitutional provision, law, statute, rule, regulation (including any stock exchange rule or regulation), ordinance, treaty, order, decree, license, permit, policy, guideline, consent, approval, certificate, judgment or decision of any governmental authority or any judgment, decree, injunction, writ, order or like action of any court or other judicial or quasi-judicial tribunal.

"**LLC**" shall have the meaning ascribed to it in the Preamble.

"**LLC Counsel**" shall have the meaning ascribed to it in Section 12.4.

"**Lien**" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, encumbrance, lien (statutory or other) or other security interest of any kind or nature whatsoever, including, without limitation, those created by, arising under or evidenced by any conditional sale or other title retention contract, the interest of a lessor under a lease which in accordance with GAAP should be recorded as a capital lease, or any financing lease having substantially the same economic effect as any of the foregoing.

"**Liquidation Event**" shall mean, in one transaction or series of related transactions, (a) the closing of the sale, transfer, exclusive license, or other disposition (whether by merger, consolidation or otherwise) of all or substantially all of (1) the assets of the LLC or (2) the assets or equity securities of one or more direct or indirect subsidiaries of the LLC constituting all or substantially all of the assets of the LLC (determined on a consolidated basis with all of the

**Page 5**

LLC's direct and indirect subsidiaries); (b) the consummation of the merger or consolidation of the LLC with or into another entity (except a merger or consolidation of the LLC in which the holders of equity securities of the LLC immediately prior to such merger or consolidation continue to hold (1) at least fifty percent (50%) of the voting power of the equity securities of the surviving entity of such merger or consolidation in substantially the same proportions (relative to all such holders) as immediately prior to the merger or consolidation and (2) securities with rights, preferences and powers that are substantially identical to the rights, preferences and powers of the securities they held immediately prior to such merger or consolidation); (c) the closing of the transfer (whether by merger, consolidation or otherwise) in one transaction or series of related transactions to a Person or group of affiliated Persons (other than an underwriter of the LLC's securities) of the LLC's securities if, after such closing, such Person or group of affiliated Persons would hold fifty percent (50%) or more of the outstanding voting securities of the LLC (or the surviving or acquiring entity); (d) the consummation of the merger or consolidation of one or more direct or indirect subsidiaries of the LLC, the assets of which subsidiary or subsidiaries (including, without limitation, the equity securities of such subsidiary or subsidiaries) constitute all or substantially all of the assets of the LLC (determined on a consolidated basis with all of the LLC's direct and indirect subsidiaries) with or into another entity (except a merger or consolidation of such subsidiary or subsidiaries (1) in which the holders of equity securities of the LLC immediately prior to such merger or consolidation continue to hold (x) at least fifty percent (50%) of the voting power of the equity securities of the surviving entity of such merger or consolidation in substantially the same proportions (relative to all such holders) as immediately prior to the merger or consolidation, (y) securities with rights, preferences and powers that are substantially identical to the rights, preferences and powers of the securities they held immediately prior to such merger or consolidation, and (z) the surviving or acquiring entity in such merger or consolidation is a wholly owned direct or indirect subsidiary of the LLC or (2) a merger or consolidation of a wholly owned direct or indirect subsidiary of the LLC with the LLC or another such wholly owned direct or indirect subsidiary); or (e) the liquidation, dissolution or winding up of the LLC.

"**Majority in Interest of the Members**" shall mean, unless otherwise expressly set forth herein, the Common Member(s) who are entitled to vote at least a majority of the outstanding Common Units.

"**Manager**" shall have the meaning ascribed to it in Section 5.1(a).

"**Members**" and "**Member**" means EMP LOAN Holdings and Sunrise as of the date of this Agreement, and thereafter, any other Person that both acquires an Interest and is admitted to the LLC as a Member in accordance with the terms of this Agreement.

"**Net Cash Flow**" means the gross cash proceeds from the LLC's operations (other than cash funds obtained as Capital Contributions and cash funds obtained from loans to the Company and excluding the proceeds of a Liquidation Event), less the portion thereof used to pay or establish reserves for expenses and fees (including fees, expenses and reimbursements paid to a Member) ordinary and necessary to the Company's business, principal and interest payments on all Company debt (including Member loans), capital improvements, replacements and contingencies. Net Cash Flow shall not be reduced by depreciation, amortization or other similar non-cash allowances, and shall be increased by any reductions in reserves which, when previously established, reduced Net Cash Flow.

"**Net Income**" and "**Net Loss**" shall mean, for each Accounting Period, an amount equal to the LLC's net taxable income or loss for such Accounting Period, determined in accordance with Code Section 703(a) (it being understood that for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in such taxable income or loss) and determined in accordance with the accounting method used by the LLC for U.S. Federal income tax purposes with the following adjustments (without duplication):

(a)     all items of income, gain, loss or deduction specifically allocated pursuant to Section 9.3 shall not be taken into account in computing such taxable income or loss;

(b)     any income of the LLC that is exempt from U.S. Federal income taxation and not otherwise taken into account in computing Net Income and Net Loss shall be added to such taxable income or loss;

(c)     if the Carrying Value of any asset differs from its adjusted tax basis for U.S. Federal income tax purposes, any gain or loss resulting from a disposition of such asset shall be calculated with reference to such Carrying Value;

(d)     upon an adjustment to the Carrying Value of any asset pursuant to clauses (ii) or (iii) of subsection (a) of the definition of Carrying Value (other than an adjustment in respect of depreciation), the amount of the adjustment shall be included as gain or loss in computing such taxable income or loss;

(e)     if the Carrying Value of any asset differs from its adjusted tax basis for U.S. Federal income tax purposes the amount of depreciation, amortization or cost recovery deductions with respect to such asset for purposes of determining Net Income and Net Loss shall be an amount which bears the same ratio to such Carrying Value as the U.S. Federal income tax depreciation, amortization or other cost recovery deductions bears to such adjusted tax basis (*provided* that if the U.S. Federal income tax depreciation, amortization or other cost recovery deduction is zero, the Board of Managers may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Net Income and Net Loss; and

(f)     except for items set forth in clauses (a) through (e) above, any expenditures of the LLC not deductible in computing taxable income or loss, not properly capitalizable and not otherwise taken into account in computing Net Income and Net Loss pursuant to this definition shall be treated as deductible items.

"**Nonrecourse Deductions**" shall be as defined in Treasury Regulations Section 1.704-2(b). The amount of Partner Nonrecourse Deductions for a Fiscal Year equals the net increase, if any, in the amount of Partnership Minimum Gain during that Fiscal Year, determined according to the provisions of Treasury Regulations Section 1.704-2(c).

"**Officer**" shall have the meaning ascribed to it in Section 7.1.

"**Parties**" shall have the meaning ascribed to it in the Preamble.

**Page 7**

"**Partner Nonrecourse Debt Minimum Gain**" shall mean an amount with respect to each partner nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(b)(4)) equal to the Partnership Minimum Gain that would result if such partner nonrecourse debt were treated as a nonrecourse liability (as defined in Treasury Regulations Section 1.752-1(a)(2)) determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Partner Nonrecourse Deductions**" shall be as defined in U.S. Treasury Regulations Section 1.704-2(i)(2).

"**Partnership Minimum Gain**" shall be as defined in Treasury Regulations Section 1.704-2(b)(2) and 1.704-2(d).

"**Partnership Representative**" shall have the meaning ascribed to it in Section 8.5.

"**Person**" shall mean a natural person, partnership (whether general or limited and whether domestic or foreign), LLC, foreign limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or representative capacity.

"**Proprietary Information**" shall have the meaning ascribed to it in Section 8.6(a).

"**Reviewed Year Member**" shall have the meaning ascribed to it in Section 8.5.

"**Rules**" shall have the meaning ascribed to it in Section 12.4.

"**SEC**" shall mean the U.S. Securities and Exchange Commission.

"**Securities Act**" shall mean the Securities Act of 1933, as amended from time to time, and the rules and regulations thereunder.

"**Sunrise Managers**" shall have the meaning ascribed to it in Section 5.1(c).

"**Transfer**" shall have the meaning ascribed to it in Section 11.1.

"**Treasury Regulations**" shall mean regulations issued pursuant to the Code.

"**Unanimous Vote**" shall mean the vote of all of the members of the Board of Managers then holding office.

"**Units**" shall mean units of Interests held by a Member representing such Member's membership interest in the LLC, whether held in the form of Common Units or other type of units or other Interests in the LLC as may be issued by the LLC.

## ARTICLE II

## FORMATION OF LIMITED LIABILITY COMPANY

2.1     <u>Formation</u>. The LLC has been formed as a Delaware limited liability company by the execution and filing of a Certificate of Formation (as the same may be amended from time to

**Page 8**

time, the "**Certificate**") by an authorized person as required by the Act. The rights, powers, duties, obligations and liabilities of the Members (in their respective capacities as such) shall be determined pursuant to the Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member (in its capacity as such) are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control. The Members hereby ratify the actions of the organizer of the LLC.

      2.2    **Name and Principal Place of Business**. Unless and until amended in accordance with this Agreement and the Act, the name of the LLC will be "Employee Loan Solutions, LLC." The principal place of business of the LLC shall be 215 Highway 101, Suite 105, Solana Beach, CA 92075, or located at such location as the Board of Managers may, from time to time, designate. The address of the LLC's registered office in the State of Delaware, and the name of the registered agent for service of process, shall be Incorporating Services, Ltd., 3500 South DuPont Highway, Dover, Delaware 19901, or such other place or person in the State of Delaware as the Board of Managers shall designate.

      2.3    **Agreement**. For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing this Agreement hereby agree to the terms and conditions of this Agreement, as it may from time to time be amended. It is the express intention of the parties hereto that, except to the extent a provision of this Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Treasury Regulations or is expressly prohibited or ineffective under the Act, this Agreement shall govern even when inconsistent with or different from the provisions of the Act or any other law or rule. To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make this Agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make valid any provision of this Agreement that was formerly invalid, such provision shall be considered to be a part of this Agreement from and after the date of such interpretation or amendment.

      2.4    **Business**. The LLC shall engage only in activities that are part of the business of banking, as described in 12 U.S.C. § 24 (Seventh), or activities that are incidental thereto. Subject to the foregoing, the LLC may engage in any lawful business permitted under the Act or the laws of any jurisdiction in which the LLC may do business, including without limitation by entering into, making and performing contracts and through other undertakings.

      2.5    **Definitions**. Terms not otherwise defined in this Agreement shall have the meanings set forth in Article I.

      2.6    **Term**. The term of the LLC commenced on the date the Certificate was filed with the Secretary of State of the State of Delaware in accordance with the Act and shall continue unless the LLC's existence is terminated pursuant to Article XIII of this Agreement.

**Page 9**

## ARTICLE III

## MEMBERS AND INTERESTS

**3.1    Units Generally**.  The Interest of each of the Members in the LLC shall consist of a number of "**Units**."  Units may be issued in one or more classes or series of classes, as approved by the Board of Managers by Unanimous Vote.  Except as otherwise provided in this Agreement or the Act, each Member holding a Unit or Units shall have (a) the right to share in the Net Income and Net Loss of the LLC as provided in this Agreement, (b) a right to the Capital Account maintained for such Member according to Article IX hereof, (c) the right to receive distributions from the LLC as provided in this Agreement, (d) the right to receive information concerning the business and affairs of the LLC as provided in this Agreement or non-waivable provisions of the Act; and (e) the right, if any, to vote as provided in this Agreement or the Act.  The Units shall be uncertificated unless the Board of Managers determines that the Units shall be represented by certificates in such form as shall be determined by the Board of Managers from time to time.  If applicable, the LLC may issue a new certificate in place of any certificate therefore issued by it, alleged to have been lost, stolen or destroyed, and the LLC may require the owner of the lost, stolen or destroyed certificate, or his or her legal representative to give the LLC a bond sufficient to indemnify it against any claim that may be made against it on account of that alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

**3.2    Classes of Units**.  Initially, there shall be one class of Units designated "Common Units" (the "**Common Units**").  The Common Units shall have the rights set forth in Section 3.1(a) through (e) and such other relative rights, powers and duties as are set forth in this Agreement.

**3.3    Members**.  The Members of the LLC are set forth on Exhibit A hereto.  Each Member shall be entitled to review such Member's Exhibit A.  Unless otherwise determined by the Board of Managers or required by law, no Member, other than any Members then serving on the Board of Managers, Sunrise and EMP LOAN Holdings, shall be entitled to receive a copy of, review or inspect any other Member's Exhibit A.  Each Member hereby waives any rights such Member may have pursuant to the Act to receive, review or inspect, directly or indirectly, any other Member's Exhibit A or any other books, records or documents containing substantially equivalent information.

**3.4    Representations and Warranties**.  Each Member hereby represents and warrants to the LLC and each other Member as follows, as of the date such Member becomes a Member:

(a)    Good Standing; Due Organization.  If such Member is a Person who is not an individual, such Member is duly organized, validly existing, and in good standing under the law of its state of organization and has full organizational power to execute and deliver this Agreement and to perform its obligations hereunder.

(b)    Accredited Investor.  (i) Such Member is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D of the Securities Act, or (ii) such Member is acquiring the respective Interest in compliance with Federal, state, local or foreign laws.

**Page 10**

(c)     <u>Purchase Entirely for Own Account</u>.  The Member is acquiring its Interest in the LLC for the Member's own account for investment purposes only and not with a view to or for the resale, distribution, subdivision or fractionalization thereof, and has no contract, understanding, undertaking, agreement or arrangement of any kind with any Person to Transfer to any Person its Interest or any part thereof, nor does such Member have any plans to enter into any such agreement.

(d)     <u>Investment Experience</u>.  By reason of the Member's business or financial experience, the Member has the knowledge, experience and capacity to evaluate and protect its own interests in connection with the transactions contemplated hereunder, is able to bear the economic and financial risks of an investment in the LLC for an indefinite period of time, and at the present time could afford a complete loss of such investment.

(e)     <u>Disclosure of Information</u>.  The Member is aware of the LLC's business affairs and financial condition and has acquired sufficient information about the LLC to reach an informed and knowledgeable decision to acquire a membership interest in the LLC.

(f)     <u>Federal and State Securities Laws</u>.  Assuming federal and state securities laws apply to the interests described herein, the Member acknowledges that the Units have not been registered under the Securities Act or any state securities laws, inasmuch as they are being acquired in a transaction not involving a public offering, and, under such laws, may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements.  In this connection, the Member represents that it is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act.

**3.5     Additional Members**.

(a)     <u>Additional Interests</u>.  Either (i) the Board of Managers by Unanimous Vote or (ii) the Board of Managers and a vote of 70% of the outstanding Units entitled to vote, shall have the right to cause the LLC to issue "**Additional Interests**."

(b)     <u>Additional Members</u>.  In order for a Person, other than an existing Member, to be admitted as a Member of the LLC with respect to an Additional Interest as defined in Section 3.5(a) above:  (i) such Additional Interest shall have been issued or sold in accordance with the terms of this Agreement; (ii) such Person shall have delivered to the LLC a counterpart signature page to this Agreement and shall have delivered such other documents and instruments as the Board of Managers determine to be necessary or appropriate and as are consistent with the terms of this Agreement in connection with the issuance or sale of such Additional Interest to such Person or to effect such Person's admission as a Member; and (iii) the Board of Managers shall amend <u>Exhibit A</u> without the further vote, act or consent of any other Person to reflect such new Person as a Member and its Interests.  Upon the amendment of <u>Exhibit A</u>, such Person shall be admitted as an additional Member (an "**Additional Member**") and deemed listed as such on the books and records of the LLC and thereupon shall be issued its Additional Interest.

**Page 11**

**3.6**    **Resignation or Withdrawal of a Member**.  Except as specifically provided herein, and subject to the provisions for Transfers contained in Article XI, no Member shall have the right to resign or withdraw from membership in the LLC or withdraw its Interest in the LLC.

**3.7**    **Meetings of the Members**.

(a)    Annual Meetings.  Annual meetings of Members entitled to vote shall be held at such date and time as shall be designated from time to time by the Board of Managers and stated in the notice of the meeting.

(b)    Special Meetings.  Special meetings of the Members, for any purpose or purposes, may be called by the Board of Managers, and shall be called by the LLC at the request of Members holding at least twenty five percent (25%) of the outstanding Units (any Units held by an Affiliate of a Member shall be treated as owned by such Member for purposes of determining the number of Units held by such Member).  Business transacted at any special meeting of Members shall be limited to the purposes stated in the notice.

(c)    Place of Meeting.  All meetings of Members shall be held at such place within or without the State of Delaware as the Board of Managers shall designate, including but not limited to by means of remote communication as herein provided.

(d)    Notice of Meetings.  Notice of all meetings of Members, including those meetings specified in Sections 3.7(a) and (b), stating the time, place and purpose of the meeting, shall be Delivered at least twenty-four (24) hours before the meeting.  Any adjourned meeting may be held as adjourned without further notice, *provided* that any adjourned session or sessions are held within ninety (90) days after the date set for the original meeting.  No notice need be given (i) to any Member if a written waiver of notice, executed before or after the meeting by such Member or his or her attorney thereunto duly authorized, is filed with the records of the meeting, or (ii) to any Member who attends the meeting without protesting prior thereto or at its commencement the lack of notice to him or her.  A waiver of notice need not specify the purposes of the meeting.

(e)    Quorum.  A quorum shall be present at any meeting of the Members if a Majority in Interest of the Members is represented at the meeting in person or by proxy, except as otherwise provided by law.  Once a quorum is present at the meeting of the Members, the Members represented in person or by proxy and entitled to vote at the meeting may conduct such business as may be properly brought before the meeting until it is adjourned, and the subsequent withdrawal from the meeting of any Member prior to adjournment or the refusal of any Member to vote shall not affect the presence of a quorum at the meeting.  If, however, such quorum shall not be present at any meeting of the Members, the Members represented in person or by proxy and entitled to vote at such meeting shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until the holders of the requisite amount of Units shall be present or represented.

(f)    Proxies.  Interests of Members may be voted in person or by an agent or agents authorized by a written proxy executed by such Member or his or her duly authorized agent, which shall be filed with the Secretary of the LLC at or before the meeting at which it is to be

**Page 12**

used. A proxy purporting to be executed by or on behalf of a Member shall be deemed valid unless challenged at or prior to its exercise and the burden of proving invalidity shall rest on the challenger, *provided* that no proxy shall be voted on or after three years from its date unless the proxy provides for a longer period. Unless and until voted, every proxy shall be revocable at the pleasure of the person who executed it or of his or her legal representatives or assigns, except in those cases where an irrevocable proxy permitted by statute has been given.

        (g)    <u>Electronic Communications</u>. Members may participate in any meeting of Members by means of telephone conference or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

        (h)    <u>Voting on Matters</u>. For purposes of voting on matters (other than a matter for which the affirmative vote of a specified portion of the Members or a class of Members is required by the Act or this Agreement, in which case the act of the Members shall be such specified portion of the Members or class of Members) at any meeting of the Members at which a quorum is present, the act of the Members shall be the affirmative vote of Members holding a majority of the Units represented at such meeting (unless the Act or this Agreement requires a greater percentage to approve such matters, in which case the Act or provision of this Agreement so specifying shall govern and control). For any vote taken by written consent in lieu of a meeting (other than with respect to a matter for which the affirmative vote of a specified portion of the Members or a class of Members is required by the Act or this Agreement, in which case the act of the Members shall be such specified portion of the Members or class of Members), the act of the Members shall be the affirmative vote of Members holding a majority of the outstanding Units.

        **3.8**    **Action by Written Consent**. Any action required to be taken at any annual or special meeting of Members or otherwise, or any action which may be taken at any annual or special meeting of Members or otherwise (including without limitation any consent, approval, vote or other action of the Members required or contemplated under or by this Agreement, the Act or otherwise), may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the Members required to approve such action as set forth in the last sentence of Section 3.7(h) above. Unless the consent of all Members entitled to vote has been solicited in writing, prompt notice of the taking of action by Members without a meeting pursuant to this Section 3.8 by less than unanimous written consent shall be given to each of those Members who have not consented in writing.

        **3.9**    **Limited Liability of Members**.

        (a)    <u>General</u>. No Member or any of its Affiliates shall have any liability for the debts, obligations or liabilities of the LLC or of any other Member or their respective Affiliates. The debts, obligations and liabilities of the LLC, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the LLC, and no Member or former Member shall be obligated personally for any such debt, obligation or liability of the LLC solely by reason of being a Member or former Member.

        (b)    <u>Deficit Capital Accounts</u>. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the

**Page 13**

extent that there exists a deficit in the Capital Account of any Member, upon dissolution of the LLC such deficit shall not be an asset of the LLC and such Members shall not be obligated to contribute such amount to the LLC to bring the balance of such Member's Capital Account to zero.

      **3.10**    <u>No Appraisal Rights</u>. No Member shall have any right to have its Units appraised and paid out under the circumstances provided in Section 18-210 of the Act, or under any other circumstances except as set forth herein or in any applicable agreement between such Member and the LLC.

      **3.11**    <u>General Voting Rights</u>. Whether by person or by proxy, each Common Member shall have the right to one (1) vote for each Common Unit held by it. A Member who has assigned some, but not all, of its, his or her Units shall be treated as a Member and entitled to a vote on all matters to the extent of its, his or her retained Units. Irrespective of any provision of Section 18-209 of the Act, but subject to the terms of this Agreement, a merger or other Liquidation Event shall not require approval by any separate class or group of Members. Except for this Agreement, no Member shall deposit any Units owned by such Member in a voting trust or subject any such Units to any arrangement or agreement with respect to the voting of such Units.

      **3.12**    <u>No Fiduciary Duties Owed by the Members</u>. To the fullest extent permitted by applicable Law (including Section 18-1101 of the Act), no Member or Affiliate of a Member acting under this Agreement shall have any fiduciary or similar duty, at law or in equity, or any liability relating thereto, to the LLC or any other Member or Affiliate of a Member, with respect to or in connection with the LLC or the LLC's business or affairs; and, without limitation, each Member when approving or disapproving any action, shall be entitled to consider only such interests and factors as such Member desires and may consider such Member's own interests or the interests of the other Members and shall have no other duty or obligation, fiduciary or otherwise, to give any consideration to any interest of or factors affecting the LLC or any other Member or Affiliate of any other Member; *provided, however*, that such other interests or other factors are known by or disclosed to the other Members, unless the failure to make such disclosure does not prejudice the interests of the LLC or such other Members or Affiliates of such other Members. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Member or Affiliate of a Member otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Member or Affiliate of a Member. For the sake of clarity, this Section 3.14 only applies to a Member or any of its Affiliates, solely in their capacity as Members and not if such Member or such Affiliate of such Member is also serving the LLC in a different capacity.

      **3.13**    <u>Related Party Transactions</u>. No transaction or contract to which the LLC is or may be a party shall be void, voidable or a breach of fiduciary responsibility for the reason that any Member, or any affiliate of any Member, is a party thereto, and such Member or its affiliates may receive fees, compensation and remuneration from the LLC for services rendered relating to the LLC business; provided, however, that such fees, compensation and other remuneration shall be generally consistent with the amount that would be paid to an unaffiliated person for similar services in the same or similar geographical area as the LLC's principal place of business.

      **3.14**    <u>Guaranteed Payments</u>. In addition to the distributions provided for in Section 10.1, each Member may receive guaranteed payments (i.e., a payment in the nature of salary or

**Page 14**

bonus) within the meaning of Code Section 707(c) from the LLC (any such payments a "**Compensation Amount**") in such Member's capacity as a Manager, Officer, Employee, Consultant or other service provider to the LLC in such amount as may be determined by the Board of Managers. Each Member hereby understands and agrees that, (a) except as may be approved pursuant to the preceding sentence, he or she shall not be entitled to receive any Compensation Amount from the LLC, and (b) all amounts otherwise distributable by the LLC may be paid to the Members pursuant to the foregoing sentence and, accordingly, no amounts may be available for distribution to the Members and assignees pursuant to Section 10.1.

3.15    <u>**Special Voting Provisions for EMP LOAN Holdings**</u>.  As long as EMP LOAN Holdings is a Member, the voting of its Units shall be by the shareholders of EMP LOAN Holdings pro rata in proportion to their holdings of outstanding shares of voting common stock of EMP LOAN Holdings, except as otherwise set forth on <u>Exhibit D</u>.  The LLC shall send all information and notices otherwise available to Members and/or EMP LOAN Holdings, in particular, both to EMP LOAN Holdings and directly to such shareholders of EMP LOAN Holdings.  For these purposes, the LLC shall be entitled to rely upon a certificate of the Secretary of EMP LOAN Holdings as to the ownership of such shareholders from time to time as requested by the LLC. Shareholders of EMP LOAN Holdings so entitled to vote shall be entitled to all related rights of Members under this Agreement.  Shareholders of EMP LOAN Holdings may provide a proxy to any Person to exercise their voting rights under this provision, such proxy to be effective as a proxy to vote Units under this Agreement.  Notwithstanding the foregoing, in the event of a vote on a Liquidation Event under Section 10.2, the shareholders of EMP LOAN Holdings shall not have such voting rights, and in such event the vote on the Liquidation Event shall be by the board of directors of EMP LOAN Holdings.

3.16    <u>**Special Member Voting Provisions**</u>.  Notwithstanding any other provisions of this Agreement, the Members shall have special approval rights and other rights as set forth in <u>Exhibit D</u>.

3.17    <u>**No Allocation of Sunrise Expenses, Taxes**</u>.  The LLC shall not enter into any tax or expense sharing arrangement with Sunrise or its Affiliates except as may be specifically required by a marketing agreement or license agreement binding upon Sunrise and the LLC, assumed by the LLC as a result of a Capital Contribution by EMP LOAN Holdings or entered into in compliance with the terms of this Agreement.

## ARTICLE IV

## CONTRIBUTIONS TO CAPITAL; WITHDRAWALS; ADVANCES

4.1    <u>**Capital Contributions**</u>.  Each Member has made, or will be deemed to be making concurrently with the execution of this Agreement, a Capital Contribution to the LLC in the amount set forth in the records of the LLC.  No Member shall be entitled to any interest or compensation with respect to such Member's Capital Contribution or share of the capital of the LLC, except as expressly provided herein.  No Member shall have any liability for the repayment of the Capital Contribution of any other Member and each Member shall look only to the assets of the LLC for return of such Member's Capital Contributions to the extent permitted herein.  Each

**Page 15**

Member holds an Interest in the LLC represented by the Units set forth opposite the Member's name on Exhibit A.

(a)    Additional Capital Contributions. Except as otherwise provided herein, no Member shall be permitted or required to make any additional Capital Contribution without the consent of the Board of Managers and such Member.

**4.2    No Right of Withdrawal**. No Member shall have the right to withdraw or receive any return of, or interest on, any portion of such Member's contributions to capital of, or to receive any distributions from, the LLC, except as provided in Articles X and XIII.

**4.3    Advances**. If any Member shall advance any funds to the LLC in excess of its Capital Contributions, the amount of such advance shall neither increase its Capital Account nor entitle that Member to any increase in its share of the distributions of the LLC. The amount of any such advance shall be a debt obligation of the LLC to such Member and shall be repaid to it by the LLC with interest at a rate and upon such other terms and conditions which the Board of Managers determines in good faith are, taken as a whole, not materially less favorable to the LLC than would be available to the LLC from an unrelated commercial lender, as shall be agreed by the LLC and such Member. Any such advance shall be payable and collectible only out of LLC assets, and the other Members shall not be personally obligated to repay any part thereof. No Person who makes any loan to the LLC shall have or acquire, as a result of making such loan, any direct or indirect interest in the profits, capital or property of the LLC, other than as a creditor.

## ARTICLE V

## MANAGEMENT AND RESTRICTIONS

**5.1    Management by Board of Managers; Board of Managers**.

(a)    Management by Board of Managers. Subject to the limitations set forth in this Agreement, the Certificate or the Act, the business and affairs of the LLC shall be managed by or under the direction of the Board of Managers, which may exercise all powers of the LLC and do all lawful acts on behalf of the LLC. The Board of Managers shall have full, exclusive and complete discretion to take all such actions as they deem necessary or appropriate to accomplish the purposes of the LLC as set forth herein. The Board of Managers shall only act collectively or by one or more committees designated by the Board of Managers in accordance with Section 5.1(h). The Board of Managers acting collectively shall be a "**manager**" within the meaning of Section 18-101(10) or Section 18-402 of the Act and no individual Manager shall be a "**manager**" except if he or she is so designated by the Board of Managers. No Manager or Member acting in his or her individual capacity shall have the right, power or authority to act on behalf of or bind the LLC, except (i) that a Manager or Member who is also an Officer of the LLC may act on behalf of or bind the LLC in his or her capacity as an Officer of the LLC to the extent that he or she is authorized to do so or (ii) to the extent a Manager is so authorized by the Board of Managers or by a specific provision of this Agreement.

(b)    Size of the Board of Managers. The Board of Managers shall initially be comprised of up to three (3) Managers, which number may be increased or decreased by

**Page 16**

amendment to this Agreement pursuant to Section 14.1. The Managers shall be appointed in accordance with Section 5.1(c).

(c)    Composition of the Board of Managers.

(i)    The initial Managers shall be as set forth on Exhibit B.

(ii)    Two of the Managers shall be appointed by Sunrise (the "**Sunrise Managers**") and one of the Managers shall be appointed by EMP LOAN Holdings by application of the provisions of Section 3.15 and majority vote of the shareholders of EMP LOAN Holdings (the "**EMP LOAN Holdings Manager**"); provided, that each EMP LOAN Holdings Manager must be a shareholder of EMP LOAN Holdings.

(iii)    Any Manager may be removed only with the consent of the Member that appointed him or her. In the event of a vacancy in the Board of Managers resulting or proposed to result from the removal of a Manager, such vacancy shall be filled only by the Member that appointed him or her.

(d)    Meetings of the Board of Managers. The Board of Managers may hold meetings, both regular and special, either within or without the State of Delaware. The first meeting of each newly elected Board of Managers shall be held immediately after the annual meeting of Members and at the same place, and no notice of such meeting shall be necessary to the newly elected Managers in order to legally constitute the meeting, provided a quorum is present. In the event such meeting is not held at that time and place, the meeting may be held at such time and place as shall be specified in a notice given as hereinafter provided for special meetings of the Board of Managers, or as shall be specified in a written waiver signed by all of the Managers. The Board of Managers shall meet once per calendar quarter unless otherwise agreed by all of the Managers and, during any period in which there are no Sunrise Managers, Sunrise. Regular meetings of the Board of Managers may, unless otherwise required by the Board of Managers, be held on not less than forty-eight (48) hours' notice to the Managers delivered either personally, by telephone, by mail, by facsimile, by email or by any other reasonable means of communication, at such time and place as shall from time to time be specified in such notice. Special meetings of the Board of Managers may be called by any Manager on not less than forty-eight (48) hours' notice to each Manager, either personally, by telephone, by mail, by facsimile, by email or by any other reasonable means of communication. Notice of a meeting need not be given to any Manager if a written waiver of notice, executed by such Manager before or after the meeting, is filed with the records of the meeting, or to any Manager who attends the meeting without protesting prior thereto or at its commencement, the lack of notice. A waiver of notice need not specify the purposes of the meeting. All Managers shall be reimbursed for their reasonable travel and other expenses incurred in connection with their attendance of Board of Managers meetings and other LLC-related business.

(e)    Quorum and Acts of the Board of Managers. Each Manager shall be entitled to one (1) vote with respect to any matter before the Board of Managers or committee thereof, except, subject to Exhibit C. Subject to Exhibit C, at all meetings of the Board of Managers, the attendance of a majority of sitting Managers (without considering any vacancies) shall constitute a quorum for the transaction of business. If a quorum shall not be present at any meeting of the

**Page 17**

Board of Managers, the Managers present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present. Subject to the terms of this Agreement, including Exhibit C, the act of a majority of the Managers present at any meeting at which there is a quorum shall be the act of the Board of Managers. Subject to Exhibit C, any action required or permitted to be taken at any meeting of the Board of Managers or of any committee thereof may be taken without a meeting, if the members of the Board of Managers or committee, as the case may be, having not less than the minimum number of votes that would be necessary to take such action at a meeting in which all members are present consent thereto in writing. Such consent shall be treated as a vote of the Board of Managers or committee, as the case may be, for all purposes. Prompt notice of the taking of any such action without a meeting by less than unanimous written consent will be given to those members who did not consent in writing to the action. Failure to provide the notice does not invalidate the written consent.

(f) <u>Electronic Communications</u>. Managers, or members of any committee designated by the Board of Managers, may participate in a meeting of the Board of Managers, or any committee, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

(g) <u>Compensation of Managers</u>. The LLC shall pay all non-employee Managers their reasonable out-of-pocket expenses, if any, of attendance at meetings of the Board of Managers. No such payment shall preclude any Manager from serving the LLC in any other capacity and receiving compensation therefor.

(h) <u>Committees, General</u>. The Board of Managers may, by resolution passed by the Board of Managers, designate one or more committees. Any such committee, to the extent provided in the resolution of the Board of Managers, shall have and may exercise all the powers and authority of the Board of Managers, but, unless the resolutions expressly so provide, no such committee shall have the power or authority to authorize the issuance of Units. Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board of Managers. Each committee shall keep regular minutes of its meetings and report the same to the Board of Managers when required.

**5.2** **Amendment of Certificate or Agreement**. Subject to the provisions of this Agreement, the Board of Managers shall have the duty and authority to amend the Certificate or this Agreement consistent with Section 14.1(a) and Section 14.1(b), respectively.

**5.3** **No Fiduciary Duties**. To the fullest extent permitted by applicable law (including Section 18-1101 of the Act), no Manager acting under this Agreement shall have any fiduciary or similar duty, at law or in equity, or any liability relating thereto, to the LLC or any other Manager, Member or Affiliate of a Member, with respect to or in connection with the LLC or the LLC's business or affairs, including any duty of any Manager, Member, Affiliate Member to refrain, or otherwise be restricted from, any business opportunity of any type or description, including those business opportunities that might be the same or similar to the business of the LLC. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Manager otherwise

**Page 18**

existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Manager.

## ARTICLE VI

## NOTICES

**6.1** **Notices**. Any notice, payment, demand or other communication required or permitted to be given by any provision of this Agreement shall be deemed to have been delivered and given for all purposes (i) if delivered personally to the party or to an officer of the party to whom the same is directed, when received by such party, (ii) if delivered by confirmed telecopy transmission or electronic mail, when received if received on a Business Day during normal business hours of the recipient, and if not, on the next Business Day, (iii) by a nationally recognized overnight courier services or (iv) whether or not the same is actually received, if sent by registered or certified mail, return receipt requested, postage and charges prepaid, addressed as follows: If to the LLC, at its principal place of business the address of which is set forth in Section 2.2; if to a Member, at such Member's address set forth on Exhibit A hereto, or to such other address as such Member may from time to time specify by written notice to the Members and the LLC; such notice shall be deemed to be given five (5) days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid. Any party may by written notice to the other parties specify a different address or facsimile number for notice purposes by sending notice thereof in the foregoing manner.

**6.2** **Waiver of Notice**. Whenever any notice is required to be given under the provisions of the Act, the Certificate or this Agreement, a waiver thereof in writing, signed by the Person or Persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto.

## ARTICLE VII

## OFFICERS

**7.1** **Officers**.

(a)      The Board of Managers may, from time to time, designate one or more persons to be officers of the LLC (each such person an "**Officer**"). Any Officers designated by the Board of Managers shall have such authority and perform such duties as the Board of Managers may, from time to time, delegate to them. The Board of Managers may assign titles to particular Officers and, unless the Board of Managers decides otherwise, if the title is one commonly used for officers of a business corporation formed under the DGCL, the assignment of such title shall constitute the delegation to such Officer of the authority and duties that are normally associated with that office, subject to any restrictions on such authority imposed by the Board of Managers. Any number of offices may be held by the same person. No Officer need be a resident of the State of Delaware or of the United States of America.

**Page 19**

(b)      Each Officer shall hold office until his or her successor shall be duly designated and qualified or until his or her death or until he or she shall resign or shall have been removed in the manner hereinafter provided.

(c)      Any Officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board of Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

(d)      Any Officer may be removed as such, either with or without cause, by the Board of Managers. Any vacancy occurring in any office of the LLC may be filled by the Board of Managers.

(e)      To the fullest extent permitted by the Act and other applicable law, and in all instances solely to the extent not inconsistent with the specific provisions of the Certificate or this Agreement, it is the intention of the parties that those Officers with titles expressly referenced in the DGCL or customarily used in corporations organized under the DGCL, in their respective capacities as such, shall, unless otherwise provided herein or determined by the Board of Managers, have the statutory and customary rights, powers, authority, duties and responsibilities of officers with similar titles of a for-profit stock corporation organized and existing under the DGCL. Without limiting the generality of the foregoing, without the approval of the Board of Managers or, to the extent required hereby or by non-waivable provisions of applicable law, no Officer shall have any right, power or authority to cause the LLC to enter into any transaction or to take any other action which would, if the LLC were a for-profit stock corporation organized and existing under the DGCL to which provisions of Subchapter XIV of the DGCL, 8 Del. Code §§ 341 ff., are not applicable, require a vote or other approval of the board of directors or stockholders of such corporation. The Members and the Board of Managers hereby delegate to each Officer such rights, powers and authority with respect to the management of the business and affairs of the LLC as may be necessary or advisable to effect the provisions of this Section 7.1(e).

(f)      The initial Officers of the LLC shall be those individuals designated as the Officers on Exhibit B.

7.2      **Reliance by Third Parties**. In dealing with the LLC and its duly appointed agents, no Person shall be required to inquire as to the LLC's or such agents' authority to bind the LLC.

7.3      **Actions and Determinations of the LLC**. Except as otherwise expressly provided herein, whenever this Agreement provides that a determination shall be made or an action shall be taken by the LLC, such determination or act shall be made or taken by the Board of Managers or, pursuant to this Agreement or with the authorization of the Board of Managers (which may be a general authorization and need not be specific as to any named person, Officer or particular transaction), by any Officer.

**Page 20**

# ARTICLE VIII

## ACCOUNTING AND RECORDS

**8.1**    **Financial and Tax Reporting**.  The LLC shall prepare its financial statements and its income tax information returns using such methods of accounting and tax year as the Board of Managers deems necessary or appropriate as permitted by the Code and Treasury Regulations.

**8.2**    **Members Access to Certain Information**.  To the extent required by, and subject to the limitations set forth in, Section 18-305 of the Act, subject to Section 8.6, the LLC shall make available, upon at least three (3) Business Days' prior written notice to the LLC, for inspection at reasonable times during business hours by a Member, the most recent balance sheet and income statement of the LLC and such other information and documents required by such Section 18-305 to be made available to Members, *provided, however*, that a Member shall not be entitled to submit more than one (1) such written notice per month.

**8.3**    **Supervision; Inspection of Books**.  Proper and complete books of account and records of the business of the LLC (including those books and records identified in the Act) shall be kept at the LLC's principal office and at any other place as designated by the Board of Managers.

**8.4**    **Tax Information**.  The LLC shall transmit to each Member, and to each person (or legal representative thereof) who was a Member during any part of the Fiscal Year in question, within a reasonable time after the end of each Fiscal Year a copy of such person's Schedule K-1 to Form 1065 for such Fiscal Year.  In the event the LLC elects to provide additional information to Members, the LLC shall be permitted to withhold any information from a Member (other than such Member's Schedule K-1 to Form 1065 for a Fiscal Year) if the LLC determines, in its reasonable discretion, that such Member has taken any action or entered into any transaction that a reasonable person would view, at the time of the action or transaction, as trading against, or in any way contrary to, the best interests of the LLC or that would make it impossible to carry on the affairs of the LLC.

**8.5**    **Tax Audits**.  Sunrise will be the "partnership representative" pursuant to Section 6223 of the Code, and in such capacity such Person will represent the LLC in all tax disputes, controversies or proceedings with the Internal Revenue Service and other relevant tax authorities (any such Person, the "**Partnership Representative**"). The Partnership Representative will be authorized and required to represent the LLC (at the LLC's expense) in connection with all examinations of the LLC's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend LLC funds in the settlement or other resolution of examinations, audits and other proceedings, as well as for professional services and other expenses reasonably incurred in connection therewith.  In accordance with the foregoing, the Partnership Representative will have all of the rights, duties, powers and obligations provided for in Sections 6221 through 6241 of the Code with respect to the LLC (including, acting on behalf of the LLC in any partnership examinations, audits or other proceedings). Each Member agrees to cooperate with the Partnership Representative and the LLC and to do or refrain from doing any or all things reasonably requested by the LLC with respect to the conduct of such proceedings. The Partnership Representative will keep the Board of Managers informed of the progress of any examinations, audits or other

**Page 21**

proceedings. Notwithstanding the foregoing, the Partnership Representative will not settle or otherwise compromise any issue in any such examination, audit or other proceeding without first obtaining approval of the Board of Managers, which, if such settlement or compromise impacts any Member in a disproportionate manner to any other Member, such Board of Manager approval shall be by Unanimous Vote. Promptly following the written request of the Partnership Representative, the LLC will, to the fullest extent permitted by law, reimburse and indemnify the Partnership Representative for all reasonable expenses, including reasonable legal and accounting fees, claims, Taxes, liabilities, losses and damages incurred by the Partnership Representative in connection with any administrative or judicial proceeding (i) with respect to the tax liability of the LLC and/or (ii) with respect to the tax liability of the Members (or former Members) in connection with the operations or activities of the LLC. If (a) the LLC becomes liable for any taxes, interest or penalties under Section 6225 of the Code, or under any analogous provision of state, local, or foreign law and (b) the amount of such tax liability that is allocable to a Person that was a Member of the LLC for all or a portion of the taxable year to which such liability relates (a "**Reviewed Year Member**"), including any associated interest and penalties, as reasonably determined by the Board of Managers, taking into account (i) the Reviewed Year Member's share of the Net Income or Net Loss, of specially allocated, individual items of LLC income, gain, deduction, and loss, and of credits to which such adjustment and imputed underpayment relate and (ii) other relevant information (for example, the Reviewed Year Member's obligation (if any) to indemnify, defend, or hold harmless the LLC or any other Member for some or all of such adjustment and imputed underpayment (and any associated interest and penalties) or the Reviewed Year Member's obligations and liabilities (if any) arising from or related to the Reviewed Year Member's representations, warranties, and covenants pursuant to this Agreement), exceeds the amount of LLC funds that otherwise would be then distributable to the Reviewed Year Member, notwithstanding any other provision of this Agreement, the Reviewed Year Member will contribute to the LLC at least three (3) business days prior to the due date of the LLC's payment the amount of funds required (*i.e.*, the full amount of the payment with respect to the Reviewed Year Member if no LLC funds would be then distributable to the Reviewed Year Member or the amount by which the amount of the payment with respect to the Reviewed Year Member exceeds the amount of LLC funds that otherwise would be then distributable to the Reviewed Year Member) to allow the LLC to satisfy fully and timely its obligation to pay such taxes, interest, or penalties under Section 6225 of the Code, or under any analogous provision of state, local, or foreign law. In addition, each of the Partnership Representative and the Board of Managers is authorized to withhold pursuant to Section 14.3 from distributions, if any, then otherwise to be made to one or more of the Reviewed Year Members and to pay to any such taxes, interest, or penalties under Section 6225 of the Code, or under any analogous provision of state, local, or foreign law. Each Reviewed Year Member shall furnish the Partnership Representative with such information as the Partnership Representative may reasonably request to permit the Partnership Representative to perform the Partnership Representative's duties under the Code. This Section 8.5 will survive (i) the termination of this Agreement, (ii) the termination, liquidation or dissolution of the LLC, and (iii) the transfer, redemption, or liquidation of a Member's interest in the LLC.

**8.6**    **Confidentiality**.

(a)    Each Member hereby acknowledges that by virtue of such Member's Interests, such Member may have access, or the LLC may allow such Member access, to business, technical, other information, materials and/or ideas or this Agreement ("**Proprietary**

**Page 22**

**Information**," which term shall include, without limitation, any information whatsoever about the LLC, including its name and industry, and including the number, identities, locations, compensation and roles of its employees, consultants, advisors, affiliates, partners, and clients, and customers, and including anything such Member learns or discovers as a result of exposure to or analysis of any Proprietary Information).   Therefore, each Member hereby agrees that such Member will hold in confidence and will not possess or use (except as required to evaluate the proposed business relationship within the U.S.) or disclose any Proprietary Information without the prior written consent of the Board of Managers, except such information that (a) was in the public domain prior to the time it was furnished to such Member, (b) is or becomes (through no willful improper action or inaction by such Member) generally available to the public, (c) was in its possession or known by such Member without restriction prior to receipt from the LLC, (d) was rightfully disclosed to such Member by a third party without restriction, (e) was independently developed without any use of the LLC's confidential information, (f) legal counsel, accountants or representatives for such Member who are bound by a duty of confidentiality, or (g) is required to be disclosed by law or the rules of any national securities exchange, association or marketplace, provided that, the Member shall notify the LLC of any such disclosure requirement as soon as practicable and reasonably cooperate with the LLC (at the LLC's cost) if the LLC seeks a protective order or other remedy in respect of any such disclosure; and  furnish only that portion of the Proprietary Information which the Member is legally required to disclose.  Each Member agrees that is will not reverse engineer or attempt to derive the composition or underlying information, structure or ideas of any Proprietary Information.  The foregoing does not grant any Member a license in or to any of the Proprietary Information.  In accordance herewith, each Member also acknowledges and agrees that due to the unique nature of the Proprietary Information, any breach of this Section 14.13 would cause irreparable harm to the LLC for which damages are not an adequate remedy, and that the LLC shall therefore be entitled to equitable relief in addition to all other remedies available at law.

(b)     The Members hereby acknowledge that the LLC creates and will be in possession of confidential information the improper use or disclosure of which could have a material adverse effect upon the LLC or upon one or more Members.  The Members hereby agree that pursuant to Section 18-305(g) of the Act, the rights of a Member to obtain information from the LLC shall be limited to only those rights provided for in this Agreement, and that any other rights provided under Section 18-305(a) of the Act shall not be available to the Members or applicable to the LLC.

## ARTICLE IX

## CAPITAL ACCOUNTS AND
## ALLOCATIONS OF NET INCOME AND NET LOSS

**9.1**     **Capital Accounts**.

(a)     A separate capital account (the "**Capital Account**") shall be established and maintained for each Member.  The Capital Account of each Member shall be credited with such Member's Capital Contributions to the LLC (net of any liabilities secured by any contributed property that the LLC is considered to assume or take subject to), all Net Income allocated to such Member pursuant to Section 9.2 and any items of income or gain which are specially allocated

**Page 23**

pursuant to Section 9.3; and shall be debited with all Net Losses allocated to such Member pursuant to Section 9.2, any items of loss or deduction of the LLC specially allocated to such Member pursuant to Section 9.3, and all cash and the Carrying Value of any property (net of liabilities assumed by such Member and the liabilities to which such property is subject) distributed by the LLC to such Member.  To the extent not provided for in the preceding sentence, the Capital Accounts of the Members shall be adjusted and maintained in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), as the same may be amended or revised.  Any references in any section of this Agreement to the Capital Account of a Member shall be deemed to refer to such Capital Account as the same may be credited or debited from time to time as set forth above.  In the event of any Transfer of any Interest in the LLC in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.  Whenever the LLC would be permitted to adjust the Capital Accounts of the Members pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) to reflect revaluations of LLC property, the Board of Managers may adjust the Capital Accounts of the Members if it determines that doing so would be appropriate.  If Code Section 704(c) applies to LLC property, the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain and loss, as computed for book purposes, with respect to such property.  The Capital Accounts shall be maintained for the sole purpose of determining the allocation of items of income, gain, loss and deduction among the Members for tax purposes and shall have no effect on the amount of any distributions to any Members in liquidation or otherwise.

(b)    No Member shall be required to pay to the LLC or to any other Member the amount of any negative balance which may exist from time to time in such Member's Capital Account.

**9.2**    **Allocations of Net Income and Net Loss**.    After making any allocations required by Section 9.3, Net Income and Net Loss of the LLC for each Fiscal Year (or other Accounting Period) shall be allocated to the Members pro rata in proportion to the number of Common Units held by each Member.

**9.3**    **Special Allocation Provisions**.    Notwithstanding any other provision in this Agreement:

(a)    Minimum Gain Chargeback.    If there is a net decrease in Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain (determined in accordance with the principles of Treasury Regulations Sections 1.704-2(d) and 1.704-2(i)) during any LLC taxable year, the Members shall be specially allocated items of LLC income and gain for such year (and, if necessary, subsequent years) in an amount equal to their respective shares of such net decrease during such year, determined pursuant to Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f). This Section 9.3(a) is intended to comply with the minimum gain chargeback requirements in such Treasury Regulations Sections and shall be interpreted consistently therewith; including that no chargeback shall be required to the extent of the exceptions provided in Treasury Regulations Sections 1.704-2(f) and 1.704-2(i)(4).

**Page 24**

(b)    <u>Qualified Income Offset</u>.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of LLC income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate the deficit balance in its Capital Account (in excess of the amounts described in clauses (i) and (ii) of Section 9.3(c) below) created by such adjustments, allocations or distributions as promptly as possible.  This Section 9.3(b) is intended to constitute a "qualified income offset" within the meaning of Treasury Regulation Section 1.704-1(b)(ii)(d).

(c)    <u>Limitation on Net Losses</u>.  If any allocation of Net Loss or an item of deduction, expenditure or loss to be made pursuant to Section 9.2 or this Section 9.3 for any Fiscal Year or other Accounting Period would cause a deficit in any Member's Capital Account (or would increase the amount of any such deficit) after (i) crediting to such Capital Account the amount that such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5), and (ii) debiting to such Capital Account the items described in Treasury Regulations 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6), then such Net Loss or item of deduction, expenditure or loss shall be allocated to the Members that have positive Capital Account balances (in excess of the amounts described in clauses (i) and (ii) of this section for such Member) in proportion to the respective amounts of such positive balances until all such positive balances have been reduced to zero.

(d)    <u>Gross Income Allocation</u>.  In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore, if any, pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of LLC income and gain in the amount of such excess as quickly as possible; *provided* that an allocation pursuant to this Section 9.3(d) shall be made only if and to the extent that a Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article IX have been tentatively made as if Section 9.3(c) and this Section 9.3(d) were not in this Agreement.

(e)    <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions shall be allocated in accordance with the number of Units held by each Member and in the same manner as if such Nonrecourse Deductions were taken into account in determining Net Income and Net Loss for such Accounting Period or Fiscal Year.

(f)    <u>Partner Nonrecourse Deductions</u>.  Partner Nonrecourse Deductions for any taxable period shall be allocated to the Member who bears the economic risk of loss with respect to the liability to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(j).

(g)    <u>Change in Interests</u>.  If there is a change in any Member's Interest in the LLC during any Fiscal Year, the principles of Section 706(d) of the Code shall apply in allocating Net Income and Net Loss and items thereof for such Fiscal Year to account for the variation. For purposes of applying Section 706(d), the Board of Managers may adopt any method or convention

**Page 25**

permitted under applicable Treasury Regulations. If there is a change in the Interest of any Member, then for purposes of applying Section 9.2 with respect to the Fiscal Period ending on the date of change, the hypothetical liquidating distributions under Section 9.2 shall be made on the basis of the Interests of each Member as applied before giving effect to such change.

(h)  Adjustments in Connection with Noncompensatory Option Exercise and Convertible Debt. The Board of Managers is hereby authorized to interpret and implement in its reasonable discretion the allocation provisions described in the Treasury Regulations 1.704-1(b)(2)(iv)(s) relating to noncompensatory options within the meaning of Treasury Regulation Sections 1.721-2(f) and 1.761-3(b)(2).

9.4  **Curative Allocations**. If the Board of Managers determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of LLC income, gain, loss, deduction or credit is not specified in this Article IX (an "<u>unallocated item</u>"), or that the allocation of any item of LLC income, gain, loss, deduction or credit hereunder is clearly inconsistent with the Members' economic interests in the LLC (determined by reference to the general principles of Treasury Regulation Section 1.704-1(b) and the factors set forth in Treasury Regulation Section 1.704-1(b)(3)(ii)) (a "<u>misallocated item</u>"), then the Board of Managers may allocate such unallocated items, or reallocate such misallocated items, to reflect such economic interests; *provided* that no such allocation shall have any effect on the amounts distributable to any Member (other than tax distributions), including the amounts to be distributed upon the complete liquidation of the LLC.

9.5  **Tax Allocations**. For income tax purposes only, each item of income, gain, loss and deduction of the LLC shall be allocated in the same manner as the corresponding items of Net Income and Net Loss and specially allocated items are allocated for Capital Account purposes; *provided* that in the case of any LLC asset the Carrying Value of which differs from its adjusted tax basis for U.S. federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for income tax purposes in accordance with the principles of Section 704(c) of the Code so as to take account of the difference between the Carrying Value and adjusted tax basis of such asset. Unless otherwise agreed by the Board of Managers, for purposes of applying the principles of Section 704(c), the LLC shall use the "traditional method" of Treasury Regulation Section 1.704-3(b).

9.6  **Compliance with Section 704(b) of the Code**. The allocation provisions contained in this Article IX are intended to comply with Section 704(b) of the Code and the Treasury Regulations promulgated thereunder, and shall be interpreted and applied in a manner consistent therewith.

## ARTICLE X

## DISTRIBUTIONS

10.1  **Distributions**.

(a)  Except as provided in this Article X, the Board of Managers will have sole discretion regarding the amounts and timing of distributions to Members. Notwithstanding any

**Page 26**

other provision of this Agreement, no distribution may be made to a Member if it (i) would violate the Act or any other applicable Law; or (ii) it would violate the terms of a loan covenant or other agreement to which the LLC is a party.

(b)    Upon the Unanimous Vote of the Board of Managers, the LLC may distribute the LLC's Net Cash Flow to the Members. No Member shall be entitled to any distribution or payment with respect to such Member's Interest in the LLC except as set forth in this Agreement.

(c)    Other than distributions pursuant to Section 10.2 or pursuant to a Liquidation Event as set forth in Section 10.3 and distributions pursuant to Section 13.4, if the Board of Managers declares and determines to or is required to make any distribution of cash or other assets to the Members, all such distributions shall be made to the Common Members pro rata in proportion to the number of Common Units held by each; *provided, however*, any distributions of all or substantially all of the assets of the LLC to Members will be made such that each Member receives the amount it would have been entitled to receive pursuant to Article XIII if the LLC had been wound-up on and as of the date of such distribution.

(d)    Except as otherwise provided by Law, no Member shall be required to restore or repay to the LLC any funds properly distributed to it pursuant to Section 10.1.

**10.2**    **Tax Distributions**.

(a)    Notwithstanding Section 10.1, within ninety (90) days of the end of each Fiscal Year, the LLC shall, unless otherwise determined by Unanimous Vote of the Board of Managers, make a distribution to each holder of Units out of any available cash of the LLC (as determined by the Board of Managers), pro rata in accordance with Common Units, of an amount reasonably estimated by the Board of Managers to equal the highest combined federal, state and local income tax applicable to an individual subject to tax in the Designated Jurisdiction with respect to net income and gain allocated to the holders of Units, after taking into account the character of the income, deductions and/or credits (including deduction under Section 199A of the Code) and the deductibility of state and local income taxes for federal income tax purposes. The determination of tax rates and other considerations for purposes of the preceding sentence shall be made by the Board of Managers in its good faith discretion after consulting with the LLC's tax advisors. For the avoidance of doubt, the references to "net income and gain" shall mean gross income and gain of the LLC allocated for all such Fiscal Years reduced by the gross amount of loss and deduction allocated for all such Fiscal Years that is available as an offset to such income and gain. Notwithstanding the foregoing, distributions pursuant to this Section 10.2 shall not be available to a Member with respect to any guaranteed payment under Code Section 707(c) or any payment to a Member not in his, her or its capacity as a Member under Code Section 707(a).

(b)    Without prejudice to the foregoing, the LLC may make a distribution out of any available cash of the LLC (as determined by the Board of Managers) to each holder of Units, pro rata in accordance with Common Units, as soon as practicable following the close of each Estimated Tax Period (each an "**Estimated Tax Distribution**") of each Fiscal Year in amounts equal to the estimated tax liability of the Unit holders relating to such Estimated Tax Period (as estimated by the Board of Managers in its good faith discretion after consulting with the LLC's

**Page 27**

tax advisors and based on the results of such quarter and using the methodology and assumptions described in Section 10.2(a)). Estimated Tax Distributions made during a Fiscal Year shall be treated as advances and shall reduce the distributions otherwise distributable in accordance with the first sentence of Section 10.2(a) for such Fiscal Year, and, if the amount of Estimated Tax Distributions for a Fiscal Year exceed the amount otherwise distributable in accordance with the first sentence of Section 10.2(a), the excess distributed to such Member shall be credited against and reduce distributions that would otherwise be made to such Member pursuant to this Section 10.2 with respect to subsequent Fiscal Years, and if the amount of Estimated Tax Distributions for a Fiscal Year is less than the amount otherwise distributable in accordance with the first sentence of Section 10.2(a), the LLC may distribute the shortfall to the Members within sixty (60) days of the end of such Fiscal Year.

### 10.3    Liquidation Event Distributions.

(a)    Upon any Liquidation Event, funds and assets of the LLC determined by the Board of Managers to be available for distribution shall be distributed to the Members pro rata in proportion to the number of Common Units held by each Member.[2]

(b)    For the avoidance of doubt, in the event of any Liquidation Event, any proceeds payable directly to the holders of Units shall be distributed among such holders of Units as though such proceeds were received by the LLC and were distributed from the LLC to the Members in accordance with this Section 10.3. For the avoidance of doubt, in the event of any Liquidation Event, if any portion of the consideration payable to the holders of Units is placed into escrow and/or is payable to such holders subject to contingencies, the definitive agreement with respect to such Liquidation Event shall provide that the portion of such consideration that is placed in escrow and/or subject to any contingencies (the "**Contingent Consideration**") shall be allocated to the Members in accordance with this Section 10.3 as if all of consideration ultimately payable in the transaction, including the Contingent Consideration, is paid without restrictions at the time of closing the Liquidation Event (so that the Contingent Consideration shall be allocated among the Members pro rata based on the amount of such consideration otherwise payable to each Member pursuant to this Section 10.3). Each Member (including any Person to whom an Interest is Transferred by another Member) agrees to take such actions as may be required, necessary or advisable to effect the intent of this Section 10.3.

(c)    If the consideration received by the LLC, or payable to the Members, is other than cash, its value shall be deemed to be the fair market value as determined in good faith by the Board of Managers.

### 10.4    No Other Withdrawals.    Except as expressly provided in this Agreement, no withdrawals or distributions shall be required or permitted.

### 10.5    Distribution Limitations.    Notwithstanding any provision to the contrary contained in this Agreement, the LLC shall not make a distribution to any Member on account of

---

[2] NTD: This assumes that the opening Capital Accounts will be pro rata.

**Page 28**

its Interest in the LLC if such distribution would violate the Act or other applicable law or breach any contract or agreement to which the LLC is a party.

**ARTICLE XI**

**TRANSFER OF MEMBERSHIP**

**11.1** <u>**Transfer**</u>. No Member may transfer, sell, encumber, mortgage, pledge, assign or otherwise dispose of, either directly or indirectly, by operation of law or otherwise (herein collectively called a "**Transfer**") any portion of its Interest in the LLC without the Unanimous Vote of the Board of Managers, and in the event the Board of Managers consents to a Transfer, such Transfer shall also be subject to the other provisions of this Article XI.

**11.2** <u>**Transfer Void**</u>. Any Transfer or attempted Transfer of an Interest in the LLC in contravention of this Agreement shall be absolutely null and void *ab initio* and of no force or effect, on or against the LLC, any Member, any creditor of the LLC or any claimant against the LLC and may be enjoined, and shall not be recorded on the books and records of the LLC. No distributions of cash or property of the LLC shall be made to any transferee of any Interest Transferred in violation hereof, nor shall any such Transfer be registered on the books of the LLC. The Transfer or attempted Transfer of any Interest in violation hereof shall not affect the beneficial ownership of such Interest, and, notwithstanding such Transfer or attempted Transfer; provided that the Member making such prohibited Transfer or attempted Transfer shall automatically lose all rights to vote, including without limitation the right to appoint a member of the Board of Managers and any rights so lost shall be automatically assigned to the remaining holders of voting Units in proportion to their Units, but shall retain the right to receive liquidation proceeds with respect to such Interest.

**11.3** <u>**Effect of Assignment**</u>. Following a Transfer of an Interest that is permitted under this Article XI, the transferee of such Interest shall be treated as having made all of the Capital Contributions in respect of, and received all of the distributions received in respect of, such Interest, shall succeed to the Capital Account associated with such Interest and shall receive allocations and distributions under Articles IX and X in respect of such Interest as if such transferee were a Member.

**11.4** <u>**Legends**</u>.

(a)     In the event the Units become certificated Units, any certificate representing Units shall be endorsed with the following legend, as well as with any legends as may be required by applicable federal and state securities laws:

> "THE SALE, PLEDGE, HYPOTHECATION, ASSIGNMENT OR TRANSFER OF THE UNITS REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN WRITTEN AGREEMENT BETWEEN THE REGISTERED HOLDERS OF THE UNITS OF THE LLC (OR THE PREDECESSOR IN INTEREST TO THE UNITS).  SUCH AGREEMENT RESTRICTS THE TRANSFER OF UNITS AND GRANTS TO THE LLC AND/OR OTHER HOLDERS OF UNITS CERTAIN RIGHTS OF FIRST

**Page 29**

REFUSAL AND/OR CO-SALE UPON AN ATTEMPTED TRANSFER OF THE UNITS.  SUCH AGREEMENT CONTAINS PROVISIONS REGARDING THE VOTING OF THE UNITS REPRESENTED BY THIS CERTIFICATE.  COPIES OF SUCH AGREEMENT MAY BE OBTAINED FROM THE ISSUER UPON WRITTEN REQUEST.  BY ACCEPTING ANY INTEREST IN SUCH UNITS THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SUCH AGREEMENT."

(b)     Any certificate issued at any time in exchange or substitution for any certificate bearing such legends shall also bear such legends, unless the Units represented thereby are no longer subject to the provisions of this Agreement or, in the opinion of the LLC (with advice from counsel to the LLC, as the LLC may deem appropriate), the restrictions imposed under the Securities Act or state securities laws are no longer applicable, in which case the applicable legend (or legends) may be removed.

**11.5**   **Publicly Traded Partnership Limitations**.  Notwithstanding any other provision of this Agreement, no Transfer shall be permitted if (i) the Board of Managers determines in its sole discretion that such transaction will either cause the LLC to be characterized as a "publicly traded partnership" or will materially increase the risk that the LLC will be so characterized or (ii) such Transfer would occur in a transaction registered or required to be registered under the Securities Act.  For purposes of this Section 11.5, the phrase "publicly traded partnership" shall have the meanings set forth in Section 7704(b) and 469(k) of the Code.  In particular and without limiting the foregoing, no Transfer shall be permitted, given effect or otherwise recognized, and such Transfer (or purported Transfer) shall be void *ab initio*, if at the time of such Transfer (or as a result of such Transfer) Units are (or would become) traded on an "established securities market" (within the meaning of Treasury Regulation Section 1.7704-1(b)) or are (or would become) "readily tradable on a secondary market or the equivalent thereof" (within the meaning of Treasury Regulation Section 1.7704-1(c)).

**11.6**   **Effective Date**.  Any Transfer in compliance with this Article XI shall be deemed effective on the first date as of which with the relevant requirements of this Agreement have been satisfied.

**11.7**   **"Market Stand-Off" Agreement**.  Each Member hereby agrees that it will not, without the prior written consent of the managing underwriter, during the period commencing on the date of the final prospectus relating to the LLC's Initial Offering and ending on the date specified by the LLC and the managing underwriter (such period not to exceed one hundred eighty (180) days plus such additional period as may reasonably be requested by the LLC or such underwriter to accommodate regulatory restrictions on (i) the publication or other distribution of research reports or (ii) analyst recommendations and opinions, including (without limitation) the restrictions set forth in Rule 2711(f)(4) of the Financial Industry Regulatory Authority and Rule 472(f)(4) of the New York Stock Exchange, as amended, or any similar successor rules) (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any Common Units, or any securities convertible into or exercisable or exchangeable for any such Units or shares held immediately prior to the

**Page 30**

effectiveness of the registration statement for such offering, or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any such Units or shares, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of such Units or shares or other securities, in cash or otherwise. The foregoing provisions of this Section 11.7 shall apply only to the LLC's Initial Offering of equity securities, shall not apply to the sale of any Units or shares to an underwriter pursuant to an underwriting agreement and shall only be applicable to the Members if all officers, managers, directors and holders of greater than one percent (1%) of the LLC's outstanding securities (on an as-converted basis) enter into similar agreements. The underwriters in connection with the LLC's Initial Offering are intended third-party beneficiaries of this Section 11.7 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. Each Member further agrees to execute such agreements as may be reasonably requested by the underwriters in the LLC's Initial Offering that are consistent with this Section 11.7 or that are necessary to give further effect thereto. Any discretionary waiver or termination of the restrictions of any or all of such agreements by the LLC or the underwriters shall apply to all Members subject to such agreements pro rata based on the number of Units or shares subject to such agreements.

In order to enforce the foregoing covenant, the LLC may impose stop-transfer instructions with respect to the above described securities of each Member (and the units, shares or securities (as applicable) of every other Person subject to the foregoing restriction) until the end of such period.

(a)     Each Member agrees that a legend reading substantially as follows shall be placed on all certificates representing the all of above described securities of each Member (and the Units, shares or securities (as applicable) of every other Person subject to the restriction contained in this Section 11.7):

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK-UP PERIOD AFTER THE EFFECTIVE DATE OF THE ISSUER'S INITIAL REGISTRATION STATEMENT FILED UNDER THE ACT, AS AMENDED, AS SET FORTH IN AN AGREEMENT BETWEEN THE LLC AND THE ORIGINAL HOLDER OF THESE SECURITIES, A COPY OF WHICH MAY BE OBTAINED AT THE ISSUER'S PRINCIPAL OFFICE. SUCH LOCK-UP PERIOD IS BINDING ON TRANSFEREES OF THESE UNITS.

**11.8    Redemption**.  The Common Units shall not be redeemable at the option of the holder thereof.

## ARTICLE XII

## INDEMNIFICATION AND LIMITATION OF LIABILITY

**12.1    Indemnification**.

(a)     For purposes of this Section 12.1(a), (i) "agent" means each Manager, former Manager, Officer, former Officer, Member and former Member of the LLC or any direct or indirect subsidiary of the LLC; (ii) "proceeding" means any threatened, pending or completed

**Page 31**

action or proceeding, whether civil, criminal, administrative, legislative or investigative; and (iii) "expenses" include, without limitation, reasonable attorneys' fees and other expenses of establishing a right of indemnification under this Section 12.1(a). The LLC shall, to the fullest and broadest extent permitted by law, indemnify and hold harmless each agent (and his heirs and legal and personal representatives) against losses and damages arising out of liabilities or expenses incurred by him as a result of serving in the capacity by reason of which such Person is deemed to be an "agent" pursuant to this subsection (a), regardless of whether the agent is or continues to be a Member, Manager or Officer at the time any such liability or expense is paid. Without limiting the generality of the foregoing, the LLC hereby agrees to indemnify each agent (and his heirs and legal and personal representatives), and to save and hold it or him harmless, from and in respect of all (1) fees, costs and expenses incurred in connection with or resulting from any demand, claim, action or proceeding against such agent (and his heirs and legal and personal representatives) or the LLC that arises out of or in any way relates to the agent's service in the capacity by reason of which such Person is deemed to be an "agent" pursuant to this subsection (a), and (2) such demands, claims, actions and proceedings and any losses or damages resulting therefrom, including judgments, fines and amounts paid in settlement or compromise (if such settlement or compromise is approved in advance by the LLC, which approval shall not be unreasonably withheld) of any such demand, claim, action or proceeding. Notwithstanding the foregoing, this right of indemnification shall not extend to (i) conduct by an agent if it is determined by a final judgment of a court of competent jurisdiction or by arbitration pursuant to Section 14.10 that such agent's conduct was undertaken in bad faith or that the agent's conduct or its acts or omissions constituted recklessness, fraud or intentional wrongdoing, or (ii) any liability arising by reason of any act or omission of an agent subsequent to his ceasing to be a Member, Manager or Officer or subsequent to the termination of the LLC. The termination of any proceeding by a judgment, order, settlement, conviction or upon a plea of nolo contendere, or its equivalent, shall not, of itself, create a presumption that the agent failed to meet the applicable standard of conduct. The LLC shall be required to pay the expenses incurred by any agent indemnified hereunder in connection with any proceeding in advance of the final disposition of such proceeding upon receipt of an undertaking by or on behalf of such agent to repay such payment if there shall be an adjudication or determination that such agent is not entitled to indemnification as provided herein.

(b)     The indemnification accorded to an agent under Section 12.1(a) shall be made solely out of the assets of the LLC, and no Member, Manager or Officer shall have any personal liability or other obligation therefor. Nothing in Section 12.1(a) shall be deemed to require any Member to make any additional Capital Contribution.

(c)     If such agent wishes to make a claim under Section 12.1(a), the agent shall notify the LLC in writing within thirty (30) days after receiving notice of the commencement of any action that may result in a right to be indemnified under Section 12.1(a); provided however that the failure to notify the LLC will not relieve the LLC of any liability for indemnification pursuant to Section 12.1(a) (except to the extent that the failure to give notice will have been materially prejudicial to the LLC).

(d)     The right to indemnification and the advancement of expenses conferred in this Section will not be exclusive of any other right which any Person may have or hereafter acquire under any statute, agreement, law, vote of the Board of Managers or otherwise. The Board of Managers may grant any rights comparable to those set forth in this Section to any employee, agent

**Page 32**

or representative of the LLC or such other Persons as it may determine. The LLC acknowledges that certain agents may have rights to indemnification, advancement of expenses and/or insurance provided by an Affiliates of such agent. The LLC agrees that, to the extent it is obligated to provide indemnification hereunder, (i) the LLC is the indemnitor of first resort (i.e., its obligations to the agents are primary and any obligation of any agent's Affiliates to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the agent is secondary), (ii) the LLC will be required to advance the full amount of expenses incurred by an agent and will be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement, without regard to any rights an agent may have against the agent's Affiliates, and (iii) the LLC irrevocably waives, relinquishes and releases the agent's Affiliates from any and all claims for contribution, subrogation or any other recovery of any kind in respect thereof. The LLC further agrees that no advancement or payment by an agent's Affiliate on behalf of the agent with respect to any claim for which the agent has sought indemnification from the LLC will affect the foregoing and the agent's Affiliates will have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of the against from the LLC. The LLC and the Members agree that each agent's Affiliates are express third party beneficiaries of the terms of this Section.

(e)     If this Section or any portion hereof is invalidated on any ground by any court of competent jurisdiction, then the LLC will nevertheless indemnify and hold harmless each agent pursuant to this Section to the fullest extent permitted by any applicable portion of this Section that has not been invalidated and to the fullest extent permitted by applicable Law.

(f)     The rights granted pursuant to this Section will be deemed contract rights, and no amendment, modification or repeal of this Section will have the effect of limiting or denying any such rights with respect to actions taken or proceedings arising prior to any such amendment, modification or repeal.

(g)     IT IS EXPRESSLY ACKNOWLEDGED THAT THE INDEMNIFICATION PROVIDED IN THIS SECTION COULD INVOLVE INDEMNIFICATION FOR NEGLIGENCE OR UNDER THEORIES OF STRICT LIABILITY.

(h)     The LLC shall maintain a Directors and Officers liability insurance policy in an amount of at least $1,000,000 unless waived by the Unanimous Vote of the Board of Managers and the LLC shall annually, within one hundred twenty (120) days after the end of each fiscal year of the LLC, deliver to each Manager a certification that such a Directors and Officers liability insurance policy remains in effect.

**12.2     Exculpation by Members**. For purposes of this Section 12.2, the term "agent" shall have the meaning assigned to such term in Section 12.1(a). No agent shall be liable to the LLC or any Member or any Person who acquires any interest in the LLC for (a) honest mistakes in judgment, or for action or inaction, taken reasonably and in good faith and for a purpose that was reasonably believed to be in the best interests of the LLC or (b) losses sustained or liabilities incurred as a result of any act or omission of such agent if such act or omission did not constitute bad faith, recklessness, fraud or intentional wrongdoing on the part of the agent. Each agent may consult with counsel, accountants and other professionals in respect of LLC affairs and shall be

**Page 33**

fully protected and justified in acting, or failing to act, if such action or failure to act is in accordance with the reasonable advice or opinion of such counsel, accountant or other professional and if such counsel, accountant or other professional shall have been selected with reasonable care. Notwithstanding the foregoing, the provisions of this Section 12.2 shall not relieve any Person of liability arising by reason of acting in bad faith, or if such Person's conduct in the performance of its duties hereunder, or its acts or omissions, constitute recklessness, fraud, intentional wrongdoing or gross negligence. This Agreement shall be construed to give effect to the provisions of this Section 12.2 to the fullest extent permitted by law.

**12.3**    **Limitation of Liability**.    Notwithstanding anything to the contrary herein contained, the debts, obligations and liabilities of the LLC shall be solely the debts, obligations and liabilities of the LLC and no Member, Manager or Officer shall be obligated personally for any such debt, obligation or liability of the LLC solely by reason of being a Member, Manager or Officer of the LLC.

## ARTICLE XIII

## DISSOLUTION AND TERMINATION

**13.1**    **Dissolution**.    The LLC shall be dissolved, its assets disposed of and its affairs wound up upon the first to occur of the following:

(a)    subject to Section 3.11, the affirmative vote of a majority of the Board of Managers; or

(b)    the entry of a decree of judicial dissolution under the Act.

Except as otherwise provided herein, the death, bankruptcy, incompetency, retirement, resignation, expulsion or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the LLC, shall not dissolve or terminate the LLC. Notwithstanding any other provision of this Agreement, the bankruptcy (as defined in Sections 18-101(1) and 18-304 of the Act) of a Member will not cause that Member to cease to be a member of the LLC, and upon the occurrence of such an event, the business of the LLC shall continue without dissolution. Notwithstanding any other provision of this Agreement, each Member waives any right it might have under Section 18-801(b) of the Act to agree in writing to dissolve the LLC upon the occurrence of the bankruptcy (as defined in Sections 18-101(1) and 18-304 of the Act) of a Member or the occurrence of any other event that causes a Member to cease to be a member of the LLC.

**13.2**    **Authority to Wind Up**.    Upon the dissolution of the LLC as set forth in Section 13.1, the Board of Managers shall have all necessary power and authority required to marshal the assets of the LLC, to pay the LLC's creditors, to distribute assets and otherwise wind up the business and affairs of the LLC. In particular, the Board of Managers shall have the authority to continue to conduct the business and affairs of the LLC insofar as such continued operation remains consistent, in the judgment of the Board of Managers, with the orderly winding up of the LLC.

**Page 34**

**13.3**    <u>**Winding Up and Certificate of Cancellation**</u>.  The winding up of the LLC shall be completed when all debts, liabilities and obligations of the LLC have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining property and assets of the LLC have been distributed to the Members.

**13.4**    <u>**Distribution of Assets**</u>.  Upon dissolution and winding up of the LLC, the affairs of the LLC shall be wound up and the LLC liquidated by the Board of Managers.  The assets of the LLC shall be distributed as follows in accordance with the Act:

(i)    to the payment of the expenses of the winding-up, liquidation and dissolution of the LLC;

(ii)    to creditors of the LLC, including, in accordance with the terms agreed among them and otherwise on a pro rata basis (based on amounts owed to them), Members who are creditors (other than in respect of distributions owing to them or to former Members hereunder), either by the payment thereof or the making of reasonable provision therefor; and

(iii)    to establish reserves, in amounts established by the Board of Managers or such liquidator, to meet other liabilities of the LLC other than to the Members or former Members in respect of distributions owing to them hereunder.

The remaining assets of the LLC shall be applied and distributed among the Members in accordance with the provisions of Section 10.3.

The distribution of cash, securities and other property to a Member in accordance with the provisions of this Section 13.4 shall constitute a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its Interest and all the LLC's property, and shall constitute a compromise to which all Members have consented within the meaning of the Act.  If such cash, securities and other property are insufficient to return such Member's Capital Contributions or returns thereon, the Member shall have no recourse against the Board of Managers, other Members or Officers.

**13.5**    <u>**Conversion to a Corporation**</u>.  If the Board of Managers determines by Unanimous Vote that it would be desirable to convert the LLC into a corporation, the Board of Managers may cause, without the consent of the Members, the conversion of the LLC into a Corporation in the manner described below (the "**Incorporation**").  The Incorporation, to the extent reasonably practicable, shall be accomplished in a tax-free manner by merger or consolidation, the filing of a certificate of conversion compliance with the DGCL, becoming a directly or indirectly wholly-owned subsidiary of a newly formed corporation or by such other means as the Board of Managers reasonably determines.  In the event of an Incorporation, each Member's Units shall be converted into securities of the corporation that to the maximum extent possible, preserve such Member's relative economic interest in the profits, losses, distributions and liquidation proceeds (determined by reference to the relative economic interests of the Members in the LLC immediately prior to the Incorporation) and each Member's relative voting and management rights under this Agreement.  By becoming parties to this Agreement, all Members consent to the conversion of their Units into shares of stock in the corporation in accordance with the terms set forth herein.  Consequently, each Member agrees to reasonably

**Page 35**

cooperate, and cause its Affiliates to reasonably cooperate, to take such actions and execute such documents as the Board of Managers may reasonably request, in order to consummate any proposed reorganization in the most tax efficient and organizationally efficient manner as is practicable under the circumstances; provided, however, that no Member shall be required to assume any liability or obligation as a result of such reorganization that is disproportionate to its relative economic interest in the corporation.

## ARTICLE XIV

## MISCELLANEOUS

### 14.1  Amendment.

(a)  Except as expressly set forth herein, this Agreement may be amended and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively), including any amendment or waiver by merger, consolidation or otherwise, only with the consent of the Board of Managers by Unanimous Vote and a vote of 70% of the outstanding Units entitled to vote.  Any amendment or waiver so effected shall be binding upon all the Parties and the Members.

(b)  The LLC will not, without the Unanimous Vote of the Board of Managers and a vote of 70% of the outstanding Units entitled to vote:

(i)  by amendment of this Agreement or through any reorganization, recapitalization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid, or consummate or agree to consummate any such action that has the effect of avoiding, the observance or performance of any of the terms to be observed or performed under this Agreement by the LLC, but will at all times in good faith assist in the carrying out of all the provisions of this Agreement; or

(ii)  amend, alter or repeal this Section 14.1 of this Agreement.

(c)  Notwithstanding the foregoing, no amendment that shall adversely affect, dilute or diminish any Member's voting, economic or other rights or interests or increase any Member's obligations or liabilities shall be adopted except with the Unanimous Vote of the Board of Managers and the consent of the Member so affected; provided, however, the authorization and issuance of Units, including any new class or series of Units, at the discretion of the Board pursuant to Section 3.1, and the amendment of this Agreement and Exhibit A to reflect the terms of such Units, will not require the approval of any Member, even if the issuance of such Units would have a dilutive effect on one or more classes or series of Units.

### 14.2  Power of Attorney.

(a)  By signing this Agreement, each Member hereby makes, constitutes and appoints the Board of Managers, and each of them, with full power of substitution and resubstitution, his, her or its true and lawful agent or agents and attorney- or attorneys-in-fact for him, her or it and in his, hers or its name, place and stead, to sign, execute, certify, acknowledge, file and record (i) the Certificate, (ii) all instruments amending, restating or canceling the

**Page 36**

Certificate, as the same may hereafter be amended or restated, that may be appropriate and (iii) such other agreements, instruments, elections or documents as may be necessary or advisable (a) to reflect the exercise by a Member of any of the powers granted to him, her or it under this Agreement, (b) to reflect the admission to the LLC of any Additional Member in accordance with Section 3.5 and (c) that may be required of the LLC or of the Members by the laws of Delaware or any other jurisdiction. Each Member authorizes such agent or attorney-in-fact to take any further action that such agent or attorney-in-fact shall consider necessary or advisable in connection with any of the foregoing, hereby giving such agent or attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in and about the foregoing as fully as such Member might or could do if personally present, and hereby ratifying and confirming all that such agent or attorney-in-fact shall lawfully do or cause to be done by virtue hereof. Each Member shall provide to the Board of Managers copies of all documents executed pursuant to the power of attorney contained in this Section 14.2.

(b)     The power of attorney granted pursuant to this Section 14.2:

(i)     is a special power of attorney coupled with an interest and is irrevocable;

(ii)     may be exercised by such attorney-in-fact by listing all of the Members executing any agreement, certificate, instrument or document with the single signature of such attorney-in-fact acting as attorney-in-fact for all of them; and

(iii)     shall survive the assignment by a Member of its Interest in the LLC, except that where the assignee thereof is admitted as a Member, the power of attorney shall survive such assignment as to the assignor Member for the sole purpose of enabling such attorney-in-fact to execute, acknowledge and file any such agreement, certificate, instrument or document as is necessary to effect such admission.

**14.3    Withholding**. The LLC shall at all times be entitled to make payments with respect to any Member in amounts required to discharge any obligation of the LLC to withhold or make payments to any governmental authority with respect to any federal, state, local, or other jurisdictional tax liability of such Member arising as a result of such Member's Interest in the LLC. To the extent each such payment satisfies an obligation of the LLC to withhold, with respect to any distribution to a Member on which the LLC did not withhold or with respect to any Member's allocable share of the income of the LLC, each such payment shall be deemed to be a loan by the LLC to such Member (which loan shall be deemed to be immediately due and payable) and shall not be deemed a distribution to such Member. The amount of such payments made with respect to such Member, plus interest, on each such amount from the date of each such payment until such amount is repaid to the LLC at an interest rate per annum equal to the prime rate published in the *Wall Street Journal* on the date of such payment by the LLC with respect to such Member, shall be repaid to the LLC by (a) deduction from any cash distributions made to such Member pursuant to this Agreement, or (b) earlier payment by such Member to the LLC, in each case as determined by the LLC in its discretion. The LLC may, in its discretion, defer making distributions to any Member owing amounts to the LLC pursuant to this Section 14.3 until such amounts are paid to the LLC and shall in addition exercise any other rights of a creditor with respect to such amounts. Each Member agrees to indemnify and hold harmless the LLC and each of the Members, from and

**Page 37**

against liability for taxes, interest, or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to said Member. Any amount payable as indemnity hereunder by a Member shall be paid promptly to the LLC upon request for such payment from the LLC, and if not so paid, the LLC shall be entitled to claim against and deduct from the Capital Account of, or from any distribution due to, the affected Member for all such amounts.

**14.4**   **Apportionment of Amounts Withheld at the Source or Paid by the LLC**.

(a)   If the LLC receives securities disposition proceeds or other income with respect to which taxes have been withheld at the source or with respect to which the LLC makes payments to any taxing authority, the aggregate amount of such taxes so withheld or paid shall be deemed for all purposes of this Agreement to have been received by the LLC and then distributed by the LLC to and among the Members based on the amount of such withholding or other taxes attributable to each Member, as determined by the Board of Managers after consulting with the LLC's accountants or other advisers, taking into account any differences in the amount of such withholding or other taxes attributable to each Member because of such Member's status, nationality or other characteristics. The intent of the preceding sentence is to have the burden of taxes withheld at the source or paid or reimbursed by the LLC borne by those Members to which such withholding or other taxes are attributable to the maximum extent possible. If the amounts deemed distributed to the Members in accordance with such sentence do not comport with the provisions of this Agreement relating to the apportionment of distributions among the Members, then, notwithstanding such distribution provisions, subsequent distributions to the Members shall be adjusted in an equitable manner by the Board of Managers to reflect the intent of such sentence.

(b)   If the LLC is required to remit cash to a governmental agency in respect of a withholding obligation arising from an in-kind distribution by the LLC or the LLC's receipt of an in-kind payment, the Board of Managers may cause the LLC to sell an appropriate portion of the property at issue and, to the extent permitted by applicable law (as determined by the Board of Managers), any resulting income or gain shall be allocated solely for income tax purposes entirely to the Member or Members in respect of which such withholding obligation arises (in such proportion as the Board of Managers shall determine in its reasonable discretion).

**14.5**   **Notice to and Consent of Members**. By executing this Agreement, each Member acknowledges that it has actual notice of and consents to (a) all of the provisions hereof (including the restrictions on Transfer), and (b) all of the provisions of the Certificate.

**14.6**   **Further Assurances**.   The parties agree to execute and deliver any further instruments or documents and perform any additional acts which are or may become necessary to effectuate and carry on the LLC created by this Agreement.

**14.7**   **Binding Effect**. Subject to the restrictions on Transfer set forth in this Agreement, this Agreement shall be binding on and inure to the benefit of the Members and their respective transferees, successors, assigns and legal representatives.

DOCS-#6178672-v6

**14.8    Governing Law**.  This Agreement shall be governed by and construed under the laws of the State of Delaware as applied to agreements among Delaware residents entered into and to be performed entirely within Delaware.

**14.9    Title to LLC Property**.  Legal title to all property of the LLC will be held and conveyed in the name of the LLC.

**14.10    Dispute Resolution**.    Any controversy, dispute, or claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement or any agreement or other instrument executed pursuant hereto or otherwise arising out of the execution of any of the foregoing, including, without limitation, any claim based on contract, tort, or statute, shall be resolved or determined, at the request of any party, by arbitration conducted in the Designated Jurisdiction, in accordance with the then-existing Rules for Commercial Arbitration of the American Arbitration Association.  Any judgment or award rendered by the arbitrator will be final, binding and non-appealable, and judgment may be entered by any State or Federal court having jurisdiction thereof.  The arbitrator shall be required to decide the controversy in accordance with applicable substantive law.  Any controversy concerning whether a dispute is an arbitrable dispute or as to the interpretation or enforceability of this Section 14.10 shall be determined by the arbitrator.  The arbitrator shall be a retired or former judge and must have substantial professional experience with regard to corporate or partnership legal matters.  All arbitration proceedings shall be held in the strictest of confidence and all parties and counsel shall be bound by such requirement of confidentiality.  The parties intend that this agreement to arbitrate be valid, enforceable and irrevocable.  The designation of a situs or a governing law for this Agreement or the arbitration shall not be deemed an election to preclude application of the Federal Arbitration Act, if it would be applicable.  In the arbitrator's award, the arbitrator shall allocate, in his or her discretion, among the parties to the arbitration all costs of arbitration, including the fees of the arbitrator and reasonable attorney's fees, costs and expert witness expenses of the parties.

**14.11    Entire Agreement**.  This Agreement and the Exhibits hereto constitute the entire agreement among the parties with respect to the subject matter herein.  This Agreement and the Exhibits hereto replace and supersede all prior agreements by and among the Members or any of them in respect of the LLC.  This Agreement and the Exhibits hereto supersede all prior written and oral statements; and no representation, statement, condition or warranty not contained in this Agreement or the Exhibits hereto will be binding on the Members or the LLC or have any force or effect whatsoever.

**14.12    Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  For the avoidance of doubt, affirmation or signature of this Agreement or Unit purchase or issuance agreement by electronic means (an "**Electronic Signature**") shall constitute the execution and delivery of a counterpart of this Agreement or a Unit purchase or issuance agreement by or on behalf of such Person intending to be bound by the terms of this Agreement.  The parties hereto agree that this Agreement, each Unit purchase or issuance agreement and any additional information incidental thereto may be maintained as electronic records.  Any Person providing an Electronic Signature further agrees to take any and all additional actions, if any, evidencing their intent to be bound by the terms of this Agreement, as may be reasonably requested by the Board of Managers.

Page 39

**14.13**   <u>No State-law Partnership</u>.  The Members intend that the LLC not be a partnership (including a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member by virtue of this Agreement, for any purposes other than for U.S. federal income tax purposes as set forth in Section 14.14, and neither this Agreement nor any other document entered into by the LLC or any Member relating to the subject matter hereof shall be construed to suggest otherwise.

**14.14**   <u>Tax Classification</u>.  It is the intent of the Members that, prior to any conversion of the LLC to a corporate legal entity in compliance with the provisions of this Agreement, the LLC shall always be operated in a manner consistent with its treatment as a "partnership" for federal, state and local income and franchise tax purposes at all times that it has two (2) or more Members. In accordance therewith, (a) no Member shall file any election with any taxing authority to have the LLC treated otherwise, and (b) each Member hereby represents, covenants, and warrants that it shall not maintain a position inconsistent with such treatment.  The Members agree that at all times that it has two (2) or more Members, except as otherwise required by applicable law, they (i) will not cause or permit the LLC to elect (A) to be excluded from the provisions of Subchapter K of the Code, or (B) to be treated as a corporation or an association taxable as a corporation for any tax purposes; (ii) will cause the LLC to make any election reasonably determined by the to be necessary or appropriate in order to ensure the treatment of the LLC as a partnership for all tax purposes; (iii) will cause the LLC to file any required tax returns in a manner consistent with its treatment as a partnership for tax purposes; and (iv) have not taken, and will not take, any action that would be inconsistent with the treatment of the LLC as a partnership for such purposes.

**14.15**   <u>Severability</u>.  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under any present or future laws applicable to the LLC effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.

**14.16**   <u>No Third Party Beneficiary</u>.  This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and permitted assigns, and no other Person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise, except that to the extent they have rights under this Agreement, EMP LOAN Holdings shareholders shall be third party beneficiaries.

**14.17**   <u>Interpretation</u>.  The titles and section headings set forth in this Agreement are for convenience only and shall not be considered as part of agreement of the parties.  When the context requires, the plural shall include the singular and the singular the plural, and any gender shall include all other genders.  No provision of this Agreement shall be interpreted or construed against any party because such party or its counsel was the drafter thereof.

\* \* \* \* \*

Page 40

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date indicated below.

Date: _____ ___, 20__                Sunrise Banks, N.A.


                                           By: _____
                                           Its: _____


Date: _____ ___, 20__                EMP LOAN Holdings, Inc.


                                           By: _____
                                           Its: _____

**Page 41**

EXHIBIT A

MEMBERS' NAMES AND ADDRESSES; UNITS; CAPITAL CONTRIBUTIONS

| Name and Address of Member | Class and Number of Units* | Capital Contribution** |
|---|---|---|
| Sunrise Banks, N.A.<br>_____<br>_____ | _____ Common Units | $[_____] |
| EMP LOAN Holdings, Inc.<br>215 Highway 101, Suite 105<br>Solana Beach, CA 92075 | _____ Common Units | $[_____] |
| TOTAL: | _____ Common Units | $[_____] |

\*       The number of Common Units to be issued to each Member is based on the number of shares of EMP LOAN Holdings outstanding as of the date of the Loan Agreement and the Conversion of the Loans as of such date in accordance with the Loan Agreement.  The number of Common Units to be issued to Sunrise pursuant to the Conversion is subject to adjustment under the Loan Agreement.

\*\*      Upon the Conversion, Sunrise and EMP LOAN Holdings will be deemed to have made a Capital Contribution pro rata based on their respective Units and the aggregate Carrying Value of the LLC's assets and liabilities at the effective time of the Conversion, and the initial Capital Account balances of Sunrise and EMP LOAN Holdings will be pro rata in accordance with their respective Units.

EXHIBIT B

MANAGERS & OFFICERS

Managers:

[_____] (Sunrise Manager)
[_____] (Sunrise Manager)
[_____] (EMP LOAN Holdings Manager)


Officers:

[_____]
[_____]
[_____]

EXHIBIT C

BOARD OF MANAGERS POWERS

**Unanimous Vote Requirements**

The following matters shall require the Unanimous Vote of the Board of Managers:

1. Set the annual budget of the LLC and adopt and update its strategic plan.
2. Any allocation, for any purpose of expenses, costs, obligations or liabilities of Sunrise to the LLC.
3. Incurring any debt to Sunrise, except in strict conformance with the terms of this Agreement permitting specific debt obligations to Sunrise.
4. Issue new classes or series of classes of Units (3.1).
5. Issue Additional Interests (except as otherwise provided in Section 3.5(a)) (3.5(a)).
6. Approve the settlement or compromise of tax issues that have a disproportionate impact on Members (8.5).
7. Deciding to distribute Net Cash Flow (10.1(b)).
8. Deciding not to make a tax distribution (10.2(a)).
9. Transfer of any Interest in the LLC (11.1).
10. Deciding not to maintain Directors and Officers insurance (12.1(h)).
11. Conversion to a corporation (13.5).
12. Amendment of the Agreement (14.1).
13. The selection of any auditor or tax advisor or tax return preparer to the LLC and the terms of engagement of any such auditor or tax advisor or tax return preparer.

**EMP LOAN Holdings Manager Vote Only**

The following matters shall require only the vote of the EMP LOAN Holdings Manager and the EMP LOAN Holdings Manager's vote shall be considered the vote of the Board of Managers:

1. Under circumstances where Sunrise is compelled by regulatory action or decides not to or is unable to originate loans in connection with any loan program of the LLC under the LLC's strategic plan:  in connection with remedying these specific deficiencies, approve, modify, negotiate and cause to be entered into on behalf of the LLC, any contract or agreement with any lender to originate those loans.
2. Negotiations, performance or other matters regarding the Marketing Agreement or License Agreement of the LLC with Sunrise and/or any other agreements between the LLC and Sunrise or any of its Affiliates.

**Majority of the Board of Managers**

The following matters shall require the vote of a majority of the full Board of Managers by written consent, or the majority of a quorum of the Board of Managers at a meeting held in accordance with this Agreement:

1. Set the compensation and fix the duties of each of the Officers of the LLC, subject to the terms of any applicable employment agreements.
2. Incur debt, other than debt to Sunrise.

EXHIBIT D

MEMBER POWERS

**Majority Vote of Membership Interests of EMP LOAN Holdings Shareholders**

The following matters shall require the affirmative vote of a majority of the voting Units of EMP LOAN Holdings by vote of the EMP LOAN Holdings shareholders:

    1.  Election of the EMP LOAN Holdings Manager (5.1(c)).

**70% Vote of the Outstanding Voting Units**

The following matters shall require the affirmative vote of 70% of the outstanding Units entitled to vote:

    1.  Issue Additional Interests (unless approved by Unanimous Vote of the Board of Managers) (3.5(a)).
    2.  Any Liquidation Event.
    3.  Any amendment of this Agreement (14.1(a)).

**Vote of a Single Member**

Any amendment of this Agreement that would adversely affect the voting or economic interests of a Member in any way shall require the approval of that Member (14.1(c)).

**Voting By EMP LOAN Holdings Board of Directors Rather than Shareholders of EMP LOAN Holdings**

As to the following matters, the EMP LOAN Holdings board of directors shall vote the Units of EMP LOAN Holdings rather than the EMP LOAN Holdings shareholders:

    1.  Voting on a Liquidation Event (3.15)

EXHIBIT E

EMPLOYMENT TERMS

Two (2) year employment agreements with the LLC all on terms to be negotiated, including six months' severance pay and change of control protections (control by other than Sunrise and/or David Reiling).  Annual salary of $250,000.00, plus health benefits substantially similar (subject to legal restrictions and availability) to the health benefits generally offered by Sunrise to its management, and no relocation of company office where duties are rendered more than 25 miles from 215 Highway 101, Solana Beach, California.

*[Additional Signature Page Form for New Members]*

IN WITNESS WHEREOF, the Member has executed this Agreement as of the date indicated below.

**MEMBER:**

Date: _____, 2017

_____
(printed name of individual or entity)

By: _____
                          (signature)

Name: _____
                    (printed name of individual signing above)

Title: _____
                    (if signing on behalf of entity)

Address:     _____

_____

Individual's State of Residence: _____

Or Entity's Principal Place of Business: _____

SIGNATURE PAGE TO
EMPLOYEE LOAN SOLUTIONS, LLC
LIMITED LIABILITY COMPANY AGREEMENT

## **EXHIBIT 2**

DISCLOSURE SCHEDULES

[attached hereto]

Schedule 2.2

**Outstanding Capital**

Cap table attached

| Person | Shares | Stock Options | As Date | As of Date | Shares redeemed | Shares Held | Stock Options | Proceeds | | Person | As of Date | Shares | Percent | Fully Diluted % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| David Rislling | 51,075 | | 0 Feburary 7, 2018 | February 8, 2018 | 0 | 51,075 | 0 | $0 | | David Rislling | Post Conversion | 51,075 | 12.82% | 12.72% |
| Michael Mason | 100,000 | | 0 Feburary 7, 2018 | February 8, 2018 | 42,569 | 57,431 | 0 | $1,771,674 | | Michael Mason | Post Conversion | 57,431 | 14.42% | 14.31% |
| Scott Davis | 86,136 | | 0 Feburary 7, 2018 | February 8, 2018 | 42,569 | 43,567 | 0 | $1,771,674 | | Scott Davis | Post Conversion | 43,567 | 10.94% | 10.85% |
| Doug Ferry | 50,000 | | 0 Feburary 7, 2018 | February 8, 2018 | 9,611 | 40,388 | 0 | $400,000 | | Doug Ferry | Post Conversion | 40,388 | 10.14% | 10.06% |
| Diego Guayan | 24,733 | | 0 Feburary 7, 2018 | February 8, 2018 | 0 | 24,733 | 0 | $0 | | Diego Guayan | Post Conversion | 24,733 | 6.21% | 6.16% |
| Doug Rooker | 0 | | 3,119 Feburary 7, 2018 | February 8, 2018 | 0 | 0 | 3,119 | $0 | | Doug Rooker | Post Conversion | 3,119 | 0.00% | 0.78% |
| ELS | 0 | | | February 8, 2018 | | 0 | 0 | $3,593,292 | | ELS | Post Conversion | 0 | 0.00% | 0.00% |
| Redemption Note | 0 | | | February 8, 2018 | | 94,749 | 0 | $0 | | Redemption Note | Post Conversion | 0 | 0.00% | 0.00% |
| Capital Note | 0 | | | | | 86,336 | 0 | | | Capital Note | Post Conversion | 0 | 0.00% | 0.00% |
| Surise | 0 | | | | | 0 | 0 | | | Surise | Post Conversion | 181,085 | 45.47% | 45.11% |
| | | | | | | | | | | | | | | |
| Total ELS Holdings | 311,944 | | 3,119 | | 94,749 | 311,944 | 3,119 | $3,943,348 | | Total w/o Options | | 398,280 | 100.00% | 100.00% |
| | | | | | | | | | | Fully Diluted | | 401,399 | | |
| Total LLL | 0 | | | | 398,280 | | 3,119 | $3,593,292 | | | | | | |

Total

| | |
|---|---|
| Capital loan | $3,593,292 |
| Redemption Loan | $3,943,348 |
| Total | $7,536,640 |

Redemption Note Needs to Increase | $0

Post Conversion Analysis at LLC %

Schedule 2.5 (b)

**Use of Proceeds; Opening Balance Sheet**

The proceeds from the Stock Redemption Loan shall be used by the Borrower to pay Parent for the purposes of redeeming shares of Parent's stock from the following shareholders of Parent in the amounts and for the price listed below

Shareholder:  Michael Maron
Total Purchase Price: $1,771,674.00
Price per share: $41.62

Shareholder:  Richard Scott Davis
Total Purchase Price: $1,771,674.00
Price per share: $41.62

Shareholder:  Douglas Farry
Total Purchase Price: $400,000.00
Price per share: $41.62

Schedule 2.7

**Property Ownership; Leases**

1. Office Lease April 11, 2016 through April 30, 2018 between Employee Loan Solutions and Solana Beach Executive Plaza, LLC

Schedule 2.8

**Ownership of Intellectual Property Rights**

1.  US Patent 7386507 Awarded, June 2008
2.  TrueConnect registered trademark
3.  www.trueconnectloans.com
4.  www.trueconnectloan.com
5.  www.trueconnectloan.net
6.  www.trueconnectloan.info
7.  www.trueconnectloan.org
8.  www.trueconnect.loan
9.  www.truconnectloan.com
10. www.truconnectloan.net
11. www.truconnectloan.info
12. www.truconnectloan.org
13. www.trueconnectbenefit.com
14. www.trueconnectassociates.com
15. www.employeeloansolutions.com
16. www.emploan.com

Schedule 2.9

**Litigation**

None

<u>Schedule 3.13</u>

**Indebtedness**

None

Schedule 3.14

**Liens or Encumbrances**

None